UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID COHEN,

Plaintiff,

vs.

LIBERTY MUTUAL GROUP INC. EXECUTIVE
PARTNERSHIP DEFERRED COMPENSATION
PLAN and LIBERTY MUTUAL GROUP INC. 2012
EXECUTIVE PARTNERSHIP PLAN,

Defendants.

No. 1:16-cv-09295-VSB

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Marc E. Bernstein
Stephen H. Harris
Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000

*Counsel for Plaintiff David Cohen*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 5

        A.      Mr. Cohen's Employment, Resignation and the Company's Benefits
                Reduction ................................................................................................. 5

        B.      Back Story of Retribution, Conflicts, Biases and Irregularities.......................... 12

III.    ANALYSIS........................................................................................................... 15

        A.      Standard of Review................................................................................... 15

        B.      The Court Should Restore Mr. Cohen's Plan Benefits ....................................... 21

IV.     CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Davis v. Commercial Bank of New York*,
   275 F. Supp. 2d 418 (S.D.N.Y. 2003)..................................................................22

*Durakovic v. Bldg. Serv. 32 BJ Pension Fund*,
   609 F.3d 133 (2d Cir. 2010)....................................................................15, 19, 24

*Halo v. Yale Health Plan*,
   819 F.3d 42 (2d Cir. 2016)............................................................... passim

*Infantolino v. Joint Industry*,
   No. 06-CV-00520 (JG), 2007 WL 879415 (E.D.N.Y. Mar. 15, 2007)...............................9, 17

*Kostas v. Prudential Ins. Co. of Am.*,
   No. 16-CV-1033(VSB), 2016 WL 5957306 (S.D.N.Y. Oct. 13, 2016) ..................................19

*McCauley v. First Unum Life Ins. Co.*,
   551 F.3d 126 (2008)..........................................................................19, 22, 24

*Metropolitan Life Ins. Co. v. Glenn*,
   554 U.S. 105 (2008)..............................................................................16, 19

*Pepe v. Newspaper and Mail Deliveries'-Publishers' Pension Fund*,
   559 F.3d 140 (2d Cir. 2009)..............................................................................22

*Rush Prudential HMO, Inc. v. Moran*,
   535 U.S. 355 (2002)..............................................................................19

*Salisbury v. Prudential Ins. Co. of Am.*,
   238 F. Supp. 3d 444 (S.D.N.Y. 2017).........................................................15, 16

*Salovaara v. Eckert*,
   222 F.3d 19 (2d Cir. 2000).........................................................................25

*Slupinski v. First Unum Life Ins. Co.*,
   554 F.3d 38 (2d. Cir. 2009).........................................................................25

STATUTES

29 U.S.C § 1133.........................................................................................17

REGULATIONS

29 C.F.R. § 2560.503-1(b)(5) ................................................................................19

29 C.F.R. § 2560.503-1(g)..................................................................................................4, 9, 17

29 C.F.R. § 2560.503-1(h)(2)(i)....................................................................................................9

29 C.F.R. § 2560.503-1(h)(2)(iii) .................................................................................................9

29 C.F.R. § 2560.503-1(h)(2)(iii) ...............................................................................................18

29 C.F.R. § 2560.503-1(m)(4) ..........................................................................................9, 17, 18

29 C.F.R. § 2560.503-1(m)(8)(i), (ii)....................................................................................9, 18

## I.     INTRODUCTION

This is a claim for benefits under ERISA brought by Plaintiff David Cohen, a former

executive of Liberty Mutual Group Inc. ("Liberty Mutual" or the "Company") who worked for

more than 16 years at the Company, earning nearly $1.3 million of compensation under two

ERISA plans (individually, the "EPP" and "EPDCP" and collectively, the "Plan" or "Plans").

The Company was both Mr. Cohen's employer and the Plan administrator, and the Company

pays all of the Plans' benefits.

In 2014 and mid-2015, Liberty Mutual began a significant restructuring of the division in

which Mr. Cohen worked ("Liberty International Underwriters" or "LIU"), installing new

management and curtailing LIU's historical autonomy and entrepreneurial culture.  Morale was

low at LIU -- many employees did not feel comfortable with the structural changes and

uncertainty in the future direction of LIU and were concerned that new LIU management did not

have sufficient specialty insurance, underwriting or international experience.

As part of the LIU reorganization, the Company planned to terminate Mr. Cohen's

employment in October 2015 -- without cause -- and offer Mr. Cohen a year's severance pay and

outplacement to help him obtain other employment.  Further, the Company planned to tell Mr.

Cohen's staff that he had decided to "retire," which is a term of art under the Company's benefit

plans meaning that the employee has the requisite age and years of service to "retire."  However,

on October 12, 2015, before the Company could inform Mr. Cohen that he was being let go, Mr.

Cohen gave the Company two weeks' notice of his resignation, effective October 26, 2015.

Mr. Cohen joined Aspen Insurance ("Aspen"), and subsequently other Liberty Mutual

employees left the Company to join Aspen.  Although Mr. Cohen did not have any non-compete

or non-solicitation agreements with Liberty Mutual, it is undisputed that he did not solicit any

Liberty Mutual employees -- either before or after his employment -- and did not assist Aspen in its recruitment of any Liberty Mutual employees.

The Company's senior management and Human Resources ("HR") were unhappy that numerous employees left to join Mr. Cohen at Aspen and they tried to stem the tide of departures. The Company conducted an investigation, including a review of Mr. Cohen's emails, and found no evidence of any wrongdoing by Mr. Cohen. Nevertheless, the Company filed suit against Aspen and others, including Mr. Cohen, in New York state court, and the Company tried to reduce Mr. Cohen's 16-plus years of pension benefits under the Company's pension plan. The Company's CEO, David Long, personally directed HR to not send standard retirement letters to Mr. Cohen and the other departing employees who were "retirement-eligible" under the Company's benefit plans. In addition, the Company's HR retroactively reduced the performance scores of Mr. Cohen and the other departing employees, not because of their performance, but for the sole purpose of rendering them ineligible for certain benefit payouts as retribution for joining Aspen. Finally, on December 23, 2015 -- more than two months after Mr. Cohen had resigned from the Company – the Company sent Mr. Cohen a notice informing him that the Company retroactively had "reclassified" his voluntary resignation as a termination for "cause" and had completely eliminated Mr. Cohen's approximately $1.3 million in benefits under the Plans. The letter did not identify any wrongful conduct by Mr. Cohen or provide him with any information required by ERISA, including how to appeal the Company's complete elimination of his Plan benefits.

Mr. Cohen twice appealed the $1.3 million reduction in his Plan benefits and he received two additional letters from the Company's HR. Just like the original December 23, 2015 adverse benefit determination, the subsequent letters did not identify any wrongful conduct whatsoever

by Mr. Cohen.

The most telling aspect of the Company's actions is that nowhere in the entire 1087-page administrative record -- including in the Company's own denial letters -- does the Company ever articulate the standard for "cause" applied in eliminating Mr. Cohen's benefits.  That is because there is zero evidence of any wrongdoing by Mr. Cohen.  The Company's position boils down to the following *ipse dixit*:  all the Company has to do is <u>say</u> the word "cause" and Mr. Cohen's benefits are wiped away.  Accordingly, the Company's final denial letter states, as its rationale: "when the Company… makes the decision that an employee's behavior warrants a termination for cause classification, benefits under the two plans are forfeited." (Pl. App. 801)[1]

Alternatively, the Company has stated that it was Mr. Cohen's <u>departure</u>, itself, that was "cause."  Of course, had the Company wanted to condition the payment of benefits upon Mr. Cohen <u>never terminating his employment</u>, it certainly could have done so in the Plans, but it did not.  Indeed, if the Company can really simply unilaterally choose to not pay benefits, the Plans are completely illusory.  It would be the ultimate "gotcha" to purport to create a "cause" standard that is <u>required</u> for forfeiture of benefits, but then assert that it is satisfied merely by mouthing the word "cause" after the participant decides to leave.  Moreover, the Plans themselves specifically state that a post-employment "cause" reclassification requires "<u>evidence</u>…after employment termination that a Participant acted or failed to act in such a manner that would have provided <u>grounds</u> for a 'cause' termination." (<u>Id</u>. 20 §7.5; 32-33 §8.5) (emphasis added)  These Plan provisions, too, would be rendered completely meaningless if, after an employee resigns,

---

[1] The complete administrative record (the "Administrative Record") is submitted herewith as Exhibit A to Plaintiff's Appendix ("App") attached to the Declaration of Marc E. Bernstein in Support of Plaintiff's Motion for Summary Judgment, submitted herewith.  The discovery permitted by the Court regarding conflicts and biases, and prior court filings, are submitted as Exhibits B through BB of that declaration.  All references are cited as "Pl. App. _."

the Company merely needs to utter the word "cause" in order to forfeit the employee's benefits.

While there is no evidence of any wrongdoing by Mr. Cohen, there substantial evidence that the Company eliminated Mr. Cohen's ERISA benefits as part of its global retribution against those who departed to join Aspen, reflecting a clear conflict of interest of the plan administrator. Indeed, the conflicts here are more obvious and egregious than in any prior decision that we have uncovered.  Not only is the Company both the Plan administrator and the payor of Plan benefits -- which the courts repeatedly have ruled is, in and of itself, a significant conflict that requires scrutiny of the benefit denial -- but substantial biases and irregularities permeated the entire process:

- the Company had its HR department -- the very department of the Company that was responsible for trying to retain, and failing to retain, the employees who departed to Aspen -- handle all aspects of this matter.

- As discussed above, the same HR department that denied Mr. Cohen's benefits took other clearly punitive actions against Mr. Cohen and the other employees that departed for Aspen by retroactively reducing their performance scores solely to render them ineligible for certain benefits and, at the direction of the Company's CEO, not sending standard retirement letters to the departing employees who were "retirement-eligible."

- The Company failed to apply "cause" under the Plans consistently to Mr. Cohen -- in the three prior instances the forfeiture for "cause" was made only after serious misconduct by the employee during employment (*e.g.*, sexual assault) and the written policy on "cause" was followed (affording the participant the opportunity to address the "cause" classification <u>before</u> it was made).  In Mr. Cohen's case, however, there was no evidence of wrongdoing at any time and Mr. Cohen was not provided any opportunity to address the "cause" re-classification before it was made.

- The HR person who eliminated Mr. Cohen's benefits (Mary Connolly) admittedly: (i) never "saw any evidence of actual wrongdoing by Mr. Cohen" and (ii) never investigated whether Mr. Cohen's emails or computer had been reviewed to see if he had taken any confidential information or had solicited any employees. (<u>Id</u>. 1493-95)

- In the Company's rush to take away Mr. Cohen's benefits, the Company did not even follow the most basic requirements of ERISA.  The December 23, 2015 adverse benefit determination did not specify: (i) "the specific plan provisions on which the determination is based," (ii) "the specific reason or reasons for the adverse determination" or (iii) "the plan's review procedures and the time limits."  29 C.F.R.

§2560.503-1(g) (mandating the requirements for any adverse benefit determination); <u>Halo v. Yale Health Plan</u>, 819 F.3d 42, 58 (2d Cir. 2016) (failure to "strictly" comply with ERISA claims regulations mandates *de novo* review by the court unless the failure was <u>both</u> inadvertent and harmless).

- Melanie Foley, the third and final HR person who upheld the elimination of Mr. Cohen's benefits, did not even examine whether her HR subordinates had followed proper procedures in eliminating his benefits -- which, in fact, they did <u>not</u> follow -- because she had the "utmost confidence" in her HR colleagues, whom she viewed as "credible" people with "good judgment."  Further, she upheld the elimination of Mr. Cohen's benefits for purported "cause" even though she knew that "there wasn't anything that turned up" in the Company's email investigation. (Pl. App. 1149 (21:4-20); 1216-17)

Mr. Cohen respectfully submits that the Company's unilateral, retroactive forfeiture of his benefits for "cause" after he left the Company fails any level of review, from arbitrary and capricious to *de novo*.  Accordingly, Mr. Cohen respectfully requests that the Court grant his motion for summary judgment and restore his benefits, and grant him attorney's fees and costs, in accordance with ERISA Sections 502(a)(1)(B), (g)(1), 29 U.S.C. §§1132(a)(1)(B), (g)(1).

## II.     FACTUAL BACKGROUND

## A.     <u>Mr. Cohen's Employment, Resignation and the Company's Benefits Reduction</u>

Mr. Cohen joined the Company in 1999 and was the President of LIU US, which was a division of the Company that insured unusual risks not covered by ordinary insurance policies. (Pl. App. 1091, ¶8; 1108, ¶8)  Mr. Cohen participated in a number of the Company's benefit plans during his employment, including the EPP (the Liberty Mutual Group Inc. Executive Partnership Plan) and the EPDCP (the Liberty Mutual Group Inc. Executive Partnership Deferred Compensation Plan). (<u>Id.</u> 1093, ¶12; 1110, ¶12)

The EPP is an ERISA incentive plan that provides participants with the right to participate in increased Company value. (<u>Id.</u> 20 §8)  The EPDCP is an ERISA deferred compensation plan that provides for cash payments. (<u>Id.</u> 30 §8)  The Plan Administrator for both Plans is the Company, and the Company pays all benefits under the Plans. (<u>Id.</u> 14 §2.1; 26 §2.1;

1217-18 (89:22-90:2))

In 2014 and mid-2015, the Company's management in Boston began significantly

restructuring LIU, installing new management and curtailing LIU's historical autonomy and

entrepreneurial culture.  This created substantial uncertainty, unhappiness, and low morale:

- "LIU historically had operated relatively independently from Liberty Mutual, and I was unhappy with Liberty Mutual's growing infiltration of LIU.  I disagreed with Liberty Mutual's approach to rate increases (which were too aggressive) and its view of appropriate product lines." (Id. 750) (Adamczyk Aff)

- "In the years prior to my departure from LIU, the company had undergone a significant restructuring under which new management (Chris Peirce, Jim Hinchley and Michael Finnegan) was installed by Liberty Mutual.  I did not feel comfortable with the continuous management and structural changes and uncertainty of the future direction of LIU and Global Specialty.  I was also concerned that the new leadership team in LIU US did not have sufficient specialty insurance experience, underwriting experience or international experience to run LIU." (Id. 771) (Harrell Aff)

- "I was not happy with the senior management changes that Liberty Mutual had implemented at LIU in the 2014/mid-2015 time period." (Id. 754) (Vaughn Aff)

- "I resigned because I was not happy with Liberty Mutual's growing involvement in LIU's operations, which historically had operated more autonomously." (Id. 755) (Russomanno Aff)

- "Liberty Mutual appointed new people to run LIU.  LIU lost its historical culture and autonomy.  I did not believe that the newly-appointed people were qualified. I also felt the opportunities for older employees were limited under the newly-appointed management." (Id. 778) (Phillips Aff)[2]

In the Fall of 2015, the Company decided to terminate Mr. Cohen's employment, without

cause, because of a "position elimination." (Id. 1488-89 (42:9-43:22); 1593-95)  Even though the

Company was planning to fire Mr. Cohen, the Company's HR department suggested telling Mr.

Cohen's staff that he had decided to "retire." (Id. 1586)  A "retirement" is a term of art under the

Company's benefit plans meaning that the employee has the requisite combination of age and

---

[2] This is just a sampling of the more than 30 affidavits in the administrative record.  The full affidavits themselves are at Pl. App. 745-783.

years of service to resign and receive "retirement" benefits in accordance with the plans. (Id. 15 §2.21; 27-28 §2.23; 1205-06 (77:4-8); 1591 ("David is retirement eligible"))  The Company planned to terminate Mr. Cohen's employment on October 15, 2015 and drafted a letter to Mr. Cohen notifying him that his "position with the Company is being eliminated," offering him a year's severance pay plus outplacement services to help him obtain other employment, and informing him that he was "retirement eligible." (Id. 1593-94)  Further, the Company prepared a script to tell Mr. Cohen that his "position is being eliminated" as of October 15 and that he was "retirement eligible." (Id. 1596)  Moreover, the Company prepared benefits-related documents that stated that Mr. Cohen was "eligible for EPP." (Id. 1594)  The Company also prepared a list of all of Mr. Cohen's vested and unvested EPP/EPDCP benefits, which had a total "outstanding value" of $1,270,625. (Id. 1600-01)  However, on October 12, 2015, three days before the Company had planned to terminate Mr. Cohen's employment without cause because of a "position elimination," Mr. Cohen notified the Company that he was resigning, and gave the Company two weeks' notice of his resignation, effective October 26, 2015. (Id. 1091, ¶8; 1108, ¶8)[3]

Mr. Cohen subsequently joined Aspen.  Thereafter, other Company employees left to join Aspen.  The departing employees who had been unhappy with the organizational changes at LIU viewed Aspen as a more nimble, growing company that presented a better career opportunity:

- "Aspen presented a superior platform and much better potential for international growth. Further, I became an Executive Vice President and global head of a product line." (Id. 750) (Adamczyk Aff)

---

[3]With respect Mr. Cohen's unvested units, one of the documents that the Company prepared in connection with its planned termination of Mr. Cohen's employment made reference to a "Post-Employment Restriction Agreement." (Id. 1598)  However, even though Mr. Cohen notified the Company of his resignation and retirement on October 12, 2015, the Company never provided any such agreement to Mr. Cohen.

- "I resigned from LIU and joined Aspen … to run a larger global footprint of a segment of business that has greater international focus and which provides superior personal and professional growth." (Id. 751) (Kania Aff)

- "Aspen was far more nimble, more entrepreneurial and provided greater opportunity for growth than LIU." (Id. 761) (Padula Aff)

- "I resigned from LIU and joined Aspen … because it was a more attractive career opportunity.  Aspen provided a greater growth mode and the position with Aspen had broader responsibilities." (Id. 767) (Rokicki Aff); see generally Id. 745-783)

Mr. Cohen was not subject to any non-competition or non-solicitation restrictions.  In fact, Mr. Cohen did not even have an employment agreement with the Company.  Nevertheless, it is uncontroverted that Mr. Cohen did not solicit any Liberty Mutual employees, either during or after his employment with the Company, and did not assist Aspen in its recruitment of any Liberty Mutual employees.  There are more than 30 affidavits in the Administrative Record attesting to this (Id. 745-783) and no evidence to the contrary.

On December 24, 2015 -- more than two months after Mr. Cohen's resignation from the Company -- Mr. Cohen received a letter from Mary Connolly ("Connolly"), Vice President and Manager of the Company's Employee Relations and HR Services, informing Mr. Cohen that his resignation had been retroactively "reclassified" as a termination for "cause" and that his Plan benefits ($1,270,625, comprised of $971,500 of vested units and $299,125 of unvested units) had been completely eliminated (the "Benefits Reduction"). (Id. 11-12)

The Benefits Reduction did not state why Mr. Cohen's resignation was reclassified as a termination of employment for "cause," and did not define what conduct constitutes "cause" under the Plans or what standard of "cause" was being applied.  Nor did the Benefits Reduction refer to any specific provision in any of the Plans.  The Benefits Reduction did not identify any wrongful conduct by Mr. Cohen that purportedly justified the decision to eliminate

-8-

approximately $1.3 million of Mr. Cohen's Plan benefits.  The Benefits Reduction also did not

identify any means by which Mr. Cohen could challenge the reduction in his benefits.  The

Benefits Reduction provided none of this information, even though the governing DOL

regulations require that an "adverse benefit determination" specify to the plan participant: (i)

"the specific plan provisions on which the determination is based," (ii) "the specific reason or

reasons for the adverse determination" and (iii) "the plan's review procedures and the time

limits."  29 C.F.R. §2560.503-1(g).[4]

Shocked at learning that the Company had unilaterally eliminated nearly $1.3 million of

his Plan benefits, and operating with virtually no information from the Company, Mr. Cohen

determined from Plan documents and the DOL regulations that he had 60 days to appeal the

Benefits Reduction (*i.e.*, on or before February 21, 2016). (Pl. App. 23 §13.2; 37 §17.2; 29

C.F.R. §2560.503-1(h)(2)(i))  However, the Plans, themselves, provide that Mr. Cohen had the

"right to review pertinent documents." (Pl. App. 23 §13.2; 37 §17.2)  Moreover, ERISA

specifically mandates that, with respect to any adverse benefit determination (which, as set forth

in footnote 4, includes a "reduction" or "termination" of a benefit) a participant must be

provided, upon request, all "relevant" information. 29 C.F.R. §2560.503-1(h)(2)(iii).  "Relevant"

information includes all documents, records or other information that was "relied upon in making

the benefit determination" or that was "submitted, considered, or generated in the course of

making the benefit determination, without regard to whether such document, record, or other

---

[4] The regulations explicitly define an "adverse benefit determination" as: "a denial, <u>reduction</u>, or <u>termination</u> of, or a failure to provide or make a payment (in whole or in part) for, <u>a benefit</u>, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's eligibility to participate in a plan...."  29 C.F.R. §2560.503-1(m)(4) (emphasis added); <u>Infantolino v. Joint Industry</u>, No. 06-CV-00520 (JG), 2007 WL 879415, at *5 (E.D.N.Y. Mar. 15, 2007) (an "adverse benefit determination" does not require that there be a previously-filed claim for benefits).

information was relied upon in making the benefit determination."  29 C.F.R. §2560.503-1(m)(8)(i), (ii).

Accordingly, on January 15, 2016, Mr. Cohen wrote to the Company and requested, among other things: all documents, records and other information that were relied upon in determining to reclassify his resignation as termination for "cause"; all documents, records and other information and/or past precedent that establishes the standard of what constitutes a termination for "cause"; identification of the specific sections of the Plan on which the adverse benefit determination was based; and identification of the individual or individuals who made the determination to reclassify Mr. Cohen's resignation as a termination for "cause." (Pl. App. 285-86)  The Company did not provide any of this requested information to Mr. Cohen.  Mr. Cohen requested the information again, in a letter dated February 2, 2016, and notified the Company that such information was important to aiding him in his appeal and was due no later than February 14, 2016 under the regulations. (Id. 291)  Instead, as discussed in Section II.B below, most of the requested information was provided only after this lawsuit was filed and the Court permitted discovery.

With the limited information that he possessed, Mr. Cohen appealed the Benefits Reduction on February 19, 2016, explaining to the Company that he had not engaged in any conduct that would amount to "cause" under any reasonable interpretation of that term and that both Plans permit a reclassification forfeiture "[i]n the event that evidence is acquired after employment termination that a Participant acted or failed to act in such a manner that would have provided grounds for a 'cause' termination…." (Id. 6; 20 §7.5; 32-33 §8.5)  Mr. Cohen also repeated his requests for information regarding the decision to retroactively eliminate his benefits. (Id. 4-5)

-10-

The Company thereafter sent Mr. Cohen a letter from another Vice President of Human Resources, Lori Andrews ("Andrews"), dated May 19, 2016, declining to reinstate his benefits (the "Andrews Letter"). (Id. 357-360)  The Andrews Letter re-characterized Mr. Cohen's February 19, 2016 appeal of the Benefits Reduction as an "initial" claim for benefits under the Plans, rather than an appeal of the Benefits Reduction.  Like the Benefits Reduction, the Andrews Letter did not define -- or even attempt to define -- what conduct constitutes "cause" under the Plans or what standard of "cause" was being applied.  Instead, the Andrews Letter merely stated that Mr. Cohen's resignation had been reclassified as a termination for "cause" and referenced the "circumstances surrounding Mr. Cohen's departure and their resulting disruption to the Company's business" -- implying that Mr. Cohen's decision to leave the Company, in and of itself, was the reason for forfeiting Mr. Cohen's benefits, rather than any improper conduct by Mr. Cohen during his employment. (Id. 358)  Tellingly, even though nearly five months had passed since the Benefits Reduction, the Andrews Letter did not point to any evidence whatsoever of any wrongdoing by Mr. Cohen to support the decision to eliminate approximately $1.3 million Mr. Cohen's ERISA benefits.

The Andrews Letter indicated that Mr. Cohen could further appeal to another HR person, Melanie Foley ("Foley"), Executive Vice President and the Company's head of HR. (Id. 360) Both Connolly and Andrews reported up to Foley. (Id. 1168 (40:7-12); 1603-04)  Accordingly, on July 21, 2017, Mr. Cohen appealed the denial to Foley. (Id. 365-799)  On September 15, 2016, Foley denied Mr. Cohen's appeal (the "Foley Letter). (Id. 800-867)  Like the Andrews Letter, the Foley Letter did not define what standard of "cause" was being applied.  Instead, like the Andrews Letter, it stated the *ipse dixit*:  "when the Company…makes the decision that an employee's behavior warrants a termination for cause classification, benefits under the two plans

-11-

are forfeited." (Id. 801)  Further, like the Andrews Letter, it simply referenced the "business disruption and tainted Company reputation caused by Mr. Cohen's <u>departure</u>" -- explicitly confirming, again, that it was Mr. Cohen's <u>departure</u> from the Company, in and of itself, that was the reason for forfeiting Mr. Cohen's benefits, rather than any improper conduct by Mr. Cohen during his employment. (Id. 801 (emphasis added))[5]  Finally, just like the Benefits Reduction and the Andrews Letter, the Foley Letter did not did not identify any wrongful conduct whatsoever by Mr. Cohen justifying the complete elimination of Mr. Cohen's benefits.

**B.    <u>Back Story of Retribution, Conflicts, Biases and Irregularities</u>**

After Mr. Cohen's resignation, the Company's most senior management and HR were upset that numerous employees left to join Mr. Cohen at Aspen, and the Company tried to penalize those who left and stem the tide of additional departures.  First, the Company reviewed Mr. Cohen's emails but found no evidence of any wrongdoing. (Id. 1216-17 (88:23-89:15); 1493 (47:12-20))  Nevertheless, the Company brought suit in state court against Aspen and others, including Mr. Cohen, and reduced Mr. Cohen's early-retirement benefits under the Liberty Mutual Retirement Plan. (Id. 11-12; 1606)[6]

Second, the Company retroactively reduced the <u>performance scores</u> of Mr. Cohen and the other departing employees for the very purpose of rendering them ineligible for certain benefit payouts -- not because the employees had actually <u>performed poorly</u> during their employment, but solely as retribution for joining Aspen. (Id. 1520-21 (74:19-75:7); 1608-11; 1613)

---

[5] The Foley Letter also referenced handwritten notes of Andrews which, likewise, referenced Mr. Cohen's "leaving" the company and taking "all those people," which presumably refers to the other departing employees who decided to leave the Company and join Aspen after Mr. Cohen had departed. (Id. 801; 1652-55)

[6] The suit was voluntarily withdrawn and dismissed with prejudice. (Id. 1606)  Section 4.1 of the Retirement Plan provides that the early-retirement benefits are restored. (Id. 90-91, §4.1)

-12-

Third, the Company's CEO, David Long, personally directed HR to not send standard retirement letters to Mr. Cohen and the other departing employees who were "retirement-eligible" under the Company's benefit plans. (Id. 1505 (59:7-12); 1615-18; 1620-22; 1624)

Fourth, the Company had its HR department -- the very department of the Company that was responsible for trying to retain, and failing to retain, the unhappy employees who departed to Aspen -- handle all aspects of this matter. (Id. 11-12; 357-60, 800-04, 1166 (38:2-10); 1167 (39:7-12); 1190-91 (62:1-63:2); 1626)  Connolly rendered the initial "cause" decision and the Benefits Reduction, Andrews decided the appeal of the Benefits Reduction, and Foley decided the final appeal. (Id. 11-12, 357-60; 800-04; 1166 (38:2-10); 1167 (39:7-12); 1496 (51:7-9) Connolly admittedly determined "cause" and wrote the Benefits Reduction even though she "never actually saw any evidence of any wrongdoing by Mr. Cohen," and she had never even bothered to investigate whether Mr. Cohen's email and computer were reviewed for any actual evidence of wrongdoing. (Id. 1492-93 (46:24-47:20); 1497 (51:7-9); 1511-12 (65:17-66:3)) Foley conceded her bias in favor of her own HR people who had eliminated Mr. Cohen's benefits: she simply "knew" and "had confidence" that her HR colleagues had followed proper procedures in reclassifying Mr. Cohen's resignation as a termination for "cause" because they were "credible" people with "good judgment" and she had the "utmost confidence" in them. (Id. 1148-49 (20:19-21:20) ("I did not investigate whether [we had] followed proper procedures")

Fifth, in all prior instances where the Company had invoked the "cause" provision to forfeit a Plan participant's ERISA benefits, the forfeiture of benefits for "cause" was made only after the participant had engaged in very serious misconduct.  In 2015, participant Cause Employee 1 invited a subordinate to his house with no one else there, got him drunk, played pool with him naked, and was "friendly" with him to the point that the subordinate woke up, realized

-13-

what was happening and "felt like he was assaulted." (Id. 1524-27 (78:11-81:1); 1628, 1630-33) The Company fully investigated the matter and confirmed the improper conduct before forfeiting Cause Employee 1's Plan benefits. (Id. 1630-33)  Likewise, in 2015, the Company forfeited participant Cause Employee 2's benefits for "cause" after Cause Employee 2 not only had an "inappropriate relationship" with a subordinate, but also had retaliated against her when she broke up with him. (Id. 1527-30 (81:2-84:8); 1635, 1637-40)  Last, in 2014, participant Cause Employee 3, who worked in the Company's corporate investments group, had an inappropriate and conflicting relationship with a vendor that her group was working with, which was confirmed through review of her emails. (Id. 1530-32 (84:9-86:13); 1642-43, 1644-47)

Sixth, in each prior instance where the Company forfeited a participant's benefits for "cause," the Company followed its own written policy on "cause" classifications before forfeiting the benefits.  The Company's policy specifically directs that: "Termination for cause, regardless of length of service, should occur only after confirmation of the inappropriate actions or behaviors." (Id. 1397)  Furthermore, it instructs that the employee's alleged actions or behaviors "should be investigated and/or verified" and, moreover, if appropriate and practical "the employee should be afforded an opportunity to address all allegations." (Id. 1395)  The Company had Mr. Cohen's home address and telephone number and also knew that he worked at Aspen -- the Company easily could have contacted Mr. Cohen, afforded him the opportunity to address any allegations of "inappropriate actions or behaviors" and, most importantly, followed its own written policy and treated him the same as the Cause Employees, all of whom were afforded an opportunity to address the "cause" classification and forfeiture of Plan benefits before it was done. (Id. 1249-30 (122:9-123:13); 1495 (49:3-16); 1629-33, 1636-40, 1644-47)

Finally, in addition to the Company's failure to provide the ERISA-mandated information

in the Benefits Reduction and its repeated failures to provide requested information, Mr. Cohen made numerous requests regarding any past precedent where "cause" was applied to forfeit Plan benefits. (Id. 3-9, 285-86, 291)  Yet, no information regarding the application of "cause" in the instances of the three Cause Employees was provided to Mr. Cohen.  Moreover, while sensitivity regarding prior "cause" forfeitures is understandable (and could have been provided on a "no-names" basis), the Foley Letter states: "In response to your inquiry as to the treatment of similarly-situated claimants, there are no such individuals." (Id. 803 (emphasis added))[7]

## III.    ANALYSIS

### A.    Standard of Review

Where the benefit plan gives the plan administrator -- here, the Company -- discretion to determine eligibility or construe the benefit plan, and the plan has "strictly" adhered to the DOL's minimum procedural requirements and there are no conflicts/biases, the district court applies an arbitrary and capricious standard of review.  Halo, 819 F.3d 42, 56 (2d Cir. 2016) (reversing district court's requirement of only "substantial compliance" with the DOL's regulations); Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 136, 141 (2d Cir. 2010) (closely examining record where same-payor conflict existed, including failures to consider evidence submitted by participant in the initial phase of the benefit forfeiture and reversing employer-administrator's decision because it was not supported by "substantial evidence").

---

[7] Even in this litigation, the Company still tried to conceal the information regarding these past forfeitures for "cause" under the Plans.  It was not until Magistrate Judge Parker compelled the Company's witnesses to answer -- they had been instructed not to answer despite the Protective Order entered by the Court and in violation of FRCP 30(c)(2)'s requirement that deposition witnesses can only be instructed to not answer based on privilege, prior court limitation or to present a motion to terminate -- that the past precedent for "cause" forfeiture was finally disclosed. (Id. 1649-51)

However, in Halo, the Second Circuit held that *de novo* review by the federal court is compelled if the benefit plan does not "strictly adhere" to the DOL's claims-procedure regulations.  Halo, 819 F.3d at 56; Salisbury v. Prudential Ins. Co. of Am., 238 F. Supp. 3d 444, 449 (S.D.N.Y. 2017) (In Halo, the Second Circuit "held that that a plan administrator must 'strictly adhere' to the regulation" to obtain arbitrary and capricious review). The Second Circuit laid out a very limited exception where the plan can establish that the failure to comply was both inadvertent and harmless.  Halo, 819 F.3d at 58; Salisbury, 238 F. Supp. 3d at 450.  The Second Circuit explained than the "inadvertent and harmless" exception is only intended for "minor" deviations and, further, specifically directed that any deviations should "not be tolerated lightly." Halo, 819 F.3d at 57.  Indeed, because of the Second Circuit's concern that the exception not "swallow[] the rule," the Second Circuit took pains to give very specific, extremely narrow examples of what could potentially qualify as an exception: "one can well imagine human error causing, for example, a plan to respond in 73 hours when the regulation requires that it do so in 72, or in 16 days instead of 15 days, and that such light delays might not harm the claimant."  Id. at 57 (citations omitted).  The Halo decision means that "if the plan administrator does not strictly comply with the Department of Labor's regulation governing the processing of an employee's claim, then *de novo* review applies to the denial of benefits, regardless of whether the plan vests discretion with the administrator."  Salisbury, 238 F. Supp. 3d at 449.  Moreover, "the plan bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it."  Halo, 819 F.3d at 58 (citation omitted).

Whether applying a *de novo* or arbitrary and capricious standard, courts typically limit their review to the administrative record and review evidence outside the record if there is "good cause," such as a conflict of interest.  Id. at 60; Metropolitan Life Ins. Co. v. Glenn, 554 U.S.

105, 111 (2008) (directing that courts must examine conflicts of interest in reviewing ERISA claims).

De novo review of the forfeiture of Mr. Cohen's Plan benefits is required under Halo. The December 23, 2015 Benefits Reduction -- which reduced Mr. Cohen's Plan benefits by approximately $1.3 million – clearly was an "adverse benefit determination" under the governing DOL regulations.  Section 2560.503-1(m)(4) of those regulations explicitly defines an "adverse benefit determination" as: "a denial, reduction, or termination of, or a failure to provide or make a payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's eligibility to participate in a plan...."  29 C.F.R. §2560.503-1(m)(4) (emphasis added).  The regulations further require that an "adverse benefit determination" notify the plan participant of: (i) "the specific plan provisions on which the determination is based," (ii) "the specific reason or reasons for the adverse determination" and (iii) "the plan's review procedures and the time limits."  29 C.F.R. §2560.503-1(g); 29 U.S.C §1133.  Yet, in the Company's rush to eliminate Mr. Cohen's benefits, the Benefits Reduction did not provide any of this information.

Contrary to the Plans' assertion, there is no requirement that a written application for benefits precede an adverse benefit determination.  The decision in Infantolino v. Joint Industry, No. 06-CV-00520 (JG), 2007 WL 879415 (E.D.N.Y. Mar. 15, 2007) is directly on point.  There, the plan asserted that the notice provisions set forth in 29 C.F.R. §2560.503-1(g) and 29 U.S.C. §1133 did not apply because the employee had not previously submitted an affirmative "claim for benefits" before the plan had terminated the employee's benefits.  The court rejected that argument -- which is the precise argument Defendants have asserted here -- holding that the termination of the employee's benefits was an "adverse benefit determination" because it fell

-17-

squarely within the definition of an "adverse benefit determination" set forth in 29 C.F.R. §2560.503-1(m)(4) and, therefore, the notice provisions in 29 C.F.R. §2560.503-1(g) were required with respect to the adverse benefit determination.  Id. at *4-5 (the assertion that that an adverse benefit determination requires a denied claim for benefits "reflects a misreading" of the regulations; "Infantolino alleges that JIB terminated his benefits based on a determination that he was unavailable for employment and therefore ineligible to receive benefits. That allegation describes a termination of benefits to which §2560.503-1(m)(4) applies.").

Not only do the regulations explicitly define a reduction or termination of benefits (both of which occurred in the Benefits Reduction) as an "adverse benefit determination" and mandate specific notice requirements for such decisions, but the overriding purpose of ERISA itself is to ensure protection and "procedural fairness" with respect to the plan participant's benefits.  Halo, 819 F.3d at 50, 53.  It would be grossly unfair, and simply make no sense, to suggest that a benefit plan can unilaterally reduce or terminate a plan participant's benefits without telling him or her precisely why it was done, what it was based on, and what the participant can do to appeal the decision. Yet, that is exactly what Defendants ask this Court to hold.

Moreover, the failure to provide the most basic and necessary notice requirements mandated by the DOL regulations is light years away from Halo's examples of very "minor" and "inadvertent" oversights like missing a deadline by an hour or a day.  After receiving the Benefits Reduction, Mr. Cohen repeatedly wrote to the Company over the following two months specifically asking not only for identification of the pertinent Plan provisions and bases for the adverse benefit determination (which should have been provided back on December 23, in accordance with 29 C.F.R. §2560. 503-1(g)), but also for all documents, records or other information that was "relied upon in making the benefit determination" or that was "submitted,

-18-

considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination." 29 C.F.R. §2560.503-1(h)(2)(iii) and (m)(8)(i),(ii); Pl. App. 3-9, 285-86, 291. He told the Company that he was "shocked" by the Benefits Reduction and that he needed this information to assist him in trying to reverse the decision. (Pl. App. 285-86)  His requests fell on deaf ears and he filed his February 19, 2016 appeal with the limited information that he had. These failures were neither "harmless" nor "inadvertent" and they continued throughout the entire process.[8]

For the reasons discussed above, *de novo* review clearly is compelled under <u>Halo</u>. However, even assuming, *arguendo*, that contrary to the facts and the applicable law, the Company had strictly complied with all of the DOL regulations, the United States Supreme Court and the Second Circuit have been extremely vigilant in protecting employee-benefits rights and directing that courts must scrutinize benefit decisions when any conflicts/biases are present. <u>Metropolitan Life</u>, 554 U.S. at 111 (directing that courts <u>must</u> examine conflicts of interest in reviewing employee benefit claims); <u>Durakovic</u>, 609 F3d 133, 142 (2d Cir. 2010) (reversing grant of summary judgment to employer and directing entry of judgment for employee); <u>McCauley v. First Unum Life Ins. Co.</u>, 551 F.3d 126, 137-38 (2008) (same); <u>Kostas v. Prudential Ins. Co. of Am.</u>, No. 16-CV-1033(VSB), 2016 WL 5957306, at *2 (S.D.N.Y. Oct. 13, 2016) (Broderick, J.) (the Supreme Court has recognized that conflicts are "to be considered in a court's review of an ERISA benefits determination").

---

[8] Furthermore, as discussed at pp. 13-14 above, the "cause" provision has not been applied consistently, as required by the claims procedure regulations, 29 C.F.R. §2560.503-1(b)(5) (plan provisions must be applied consistently), and directly contrary to ERISA's overall purpose of promoting predictability and uniformity.  <u>Rush Prudential HMO, Inc. v. Moran</u>, 535 U.S. 355, 379 (2002).

Here, as discussed in Section II.B above, the conflicts are more egregious than in any prior decision that we have uncovered and warrant very substantial scrutiny of the benefit forfeiture.  Not only is it undisputed that the Company is both the plan administrator of the Plans and the payor of benefits -- which the courts repeatedly have ruled is, in and of itself, a significant conflict requiring scrutiny of the decision (Met Life; Durakovic; McCauley; Kostas) -- but substantial conflicts and biases pervaded the entire process: (i) the Company had its HR department, which had been directly responsible for, but had failed to, retain the unhappy employees who departed Liberty Mutual to join Mr. Cohen at Aspen, also handle all aspects of forfeiting Mr. Cohen's benefits; (ii) in addition to eliminating Mr. Cohen's Plan benefits, the Company took other, clearly punitive actions against Mr. Cohen and the other employees who departed for Aspen, including retroactively reducing their performance scores solely for the purpose of rendering them ineligible for certain benefit payouts and, at the specific direction of Liberty Mutual's CEO, not sending standard retirement letters to those departing employees who were "retirement-eligible" under Liberty Mutual's benefit plans; (iii) Foley did not even examine whether her HR subordinates had followed proper procedures in determining "cause" and eliminating Mr. Cohen's benefits – and they hadn't even followed the Company's own written policy on "cause" classifications -- because she simply "knew" they did, "had confidence that they did," and her HR colleagues were "credible" people with "good judgment" and in whom she had the "utmost confidence"; and (iv) Connolly determined "cause" even though she admittedly "never actually saw any evidence of any wrongdoing by Mr. Cohen" and had never bothered to investigate whether Mr. Cohen's emails or computer were reviewed after his departure for any actual evidence of wrongdoing.[9]

---

[9] The Company also did not even follow the terms of the Plans in having Connolly forfeit Mr.

(continued...)

This case cries out for the Court to scrutinize the Administrative Record to determine whether, more than two months after Mr. Cohen had resigned from the Company and after the Company previously had decided to terminate his employment <u>without</u> "cause," there were sufficient grounds to reclassify Mr. Cohen's resignation as a termination for "cause" and completely eliminate Mr. Cohen's Plan benefits.

**B.**     **<u>The Court Should Restore Mr. Cohen's Plan Benefits</u>**

While *de novo* review is compelled under <u>Halo</u>, the Company's purported forfeiture of Mr. Cohen's benefits for "cause" -- without any evidence whatsoever of any misconduct by Mr. Cohen -- fails any level of review for multiple reasons.

Mr. Cohen did not engage in any conduct constituting "cause" under any reasonable definition of that term.  Neither the Benefits Reduction nor the Foley and Andrews denial letters identify any conduct by Mr. Cohen to support a "cause" determination, or even attempt to define a "cause" standard.  Instead, they merely reference Mr. Cohen's <u>departure</u> from the Company, rather than any misconduct during his employment, unlike the Cause Employees, all of whom engaged in misconduct constituting "cause" during their employment warranting the forfeiture of their Plan benefits.  Of course, had the Company wanted to condition the payment of benefits

---

(...continued)
Cohen's Plan benefits instead of the Company's <u>Compensation Committee</u>.  Both Plans mandate that "[o]nly the <u>Committee</u> shall be authorized to act on the Company's behalf with respect to <u>the exercise of discretion</u> as may be required or permitted under the Plan" and provide that the Company "shall have the <u>right</u>" to forfeit outstanding units if evidence is acquired after employment termination that would have provided grounds for a "cause" termination. (Pl. App. 16 §3; 20 §7.5; 28 §3; 32-33 §8.5) (emphasis added)  Thus, even if "cause" exists, the Company has the <u>right</u> to forfeit benefits, but it does not <u>have to</u> do so and it is not automatic. The Company has to determine whether to exercise that right, which clearly is a discretionary decision.  Furthermore, the determination as to whether there is sufficient "evidence" and "grounds" clearly are judgment calls. Nevertheless, <u>Connolly</u> made those decisions (and there is no evidence in the Administrative Record that the Committee delegated such authority to Connolly).

upon Mr. Cohen <u>never terminating his employment</u>, it certainly could have done so in the Plans, but it did not.  Rather, in the ultimate attempted "gotcha," the Company purported to create a "cause" standard for forfeiture of Plan benefits -- and applied it to prior participants who engaged in wrongdoing during their employment -- but the Company now says "cause" really just means "departure."  Likewise, the subsequent decisions of <u>other</u> LIU employees to leave the Company after Mr. Cohen left cannot serve as a legitimate basis for the Company to reduce Mr. Cohen's benefits.

The denial letters take the position that all the Company – which is also the plan administrator -- has to do is <u>utter</u> the word "cause" and the benefits are wiped away.  The Foley letter states: "when the Company . . . makes the decision that an employee's behavior warrants a termination for cause classification, benefits under the two plans are forfeited." (Pl. App. 801) For the Company to be able to simply unilaterally <u>choose</u> to not pay benefits would render the Plans completely a completely illusory and meaningless benefit.  <u>E.g.</u>, <u>Davis v. Commercial Bank of New York</u>, 275 F. Supp. 2d 418, 424 (S.D.N.Y. 2003) (rejecting plan's assertion that benefits can be denied if employer simply chooses to not pay benefits, despite plan provision conferring discretion on the company, because such a reading of the plan "would render the Plan meaningless").  Moreover, the Plans themselves specifically state that a post-employment reclassification for "cause" requires "<u>evidence</u> . . . after employment termination that a Participant acted or failed to act in such a manner that would have provided <u>grounds</u> for a 'cause' termination." (Pl. App. 20, 33) (emphasis added)  These Plan provisions, too, would be rendered completely meaningless by an assertion that the Company merely needs to say the word "cause" in order to forfeit an employee's benefits.

It is hornbook law that the terms of a benefit plan should be interpreted as having their

ordinary meaning.  Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund, 559 F.3d 140, 147 (2d Cir. 2009) ("We construe ERISA plans according to federal common law, and interpret them 'in an ordinary and popular sense as would a person of average intelligence and experience.'") (citation omitted); McCauley, 551 F.3d at 133 (arbitrary and capricious action can be inferred "where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words") (emphasis added; citation omitted).

Any reasonable definition of a termination of employment for "cause" includes some standard of misconduct that warrants the termination of employment.  For example, while the EPP and EPDCP do not define the standard for a "cause" reclassification, the Company's Supplemental Income at Retirement Plan -- in which Mr. Cohen is a participant -- defines "cause" as follows:

> Termination "for cause" shall arise where termination results from (A) conviction of, or the pleading of nolo contendere to, a felony; (B) misconduct by the Participant which is of such a serious and substantial nature that a reasonable likelihood exists that such misconduct will materially injure the reputation of the Company or an Affiliated Employer if the Participant was to remain employed by the Company or Affiliated Employer; or (C) proven negligence.

(Pl. App. 270, §3.3(b))

Likewise, the Company's own written policy on "cause" terminations explicitly references "confirmation of the inappropriate actions or behaviors" and that the employee be afforded an opportunity to "address all allegations." (Id. 1396-97)  Moreover, the EPP and EPDCP, themselves, specifically reference "evidence" and "grounds" for a cause reclassification.  It is patently unreasonable to forfeit Mr. Cohen's Plan benefits for "cause" without any evidence of wrongdoing.

Not only is there no evidence of wrongdoing by Mr. Cohen, but it is undisputed that the

-23-

Company itself was going to terminate Mr. Cohen's employment <u>without</u> cause because of "position elimination" right up to the day that he resigned and, as discussed above, his mere decision to resign from the Company cannot be "evidence" of "grounds" for "cause."  Moreover, it is undisputed in the Administrative Record that even though Mr. Cohen did not have any non-compete or non-solicitation agreements with the Company, he still refrained from soliciting any Company employees or assisting Aspen in its recruitment of any such employees.  Indeed, it is undisputed in the Administrative Record that the employees who departed the Company after Mr. Cohen's departure left because they were unhappy with the structural changes at LIU, were concerned that the new LIU management did not have sufficient specialty insurance experience, underwriting experience or international experience, and viewed Aspen as a more nimble, growing company that presented a better career opportunity.  There is simply no evidence in the Administrative Record to the contrary.

Accordingly, even assuming, *arguendo*, that arbitrary and capricious (rather than *de novo*) review were applicable, there is nothing even close to "substantial evidence" in the Administrative Record that is required to support a benefit reduction.  <u>Durakovic</u>, 609 F.3d at 138; <u>McCauley</u>, 551 F.3d at 137-38.  In the absence of "substantial evidence" in the Administrative Record <u>supporting</u> the benefit denial, the Second Circuit has not hesitated to not only reverse the plan's decision, and reverse the district courts' grant of summary judgment to the plan, but also to direct the immediate entry of summary judgment for the plan participant. <u>Durakovic</u>, 609 F.3d at 138 (reversing district court's grant of summary judgment to employer and directing entry of judgment for employee); <u>McCauley</u>, 551 F.3d 137-38 (same).

While there nothing even close to "substantial evidence" <u>supporting</u> a forfeiture of benefits for termination for "cause," the evidence is overwhelming that what really happened

here is the Company forfeited Mr. Cohen's benefits as part of its retribution against employees

who departed the Company to join Aspen.  Once they realized that he went to work for a

competitor and others had followed him, they tried to figure out a way to penalize Mr. Cohen.

And, they did: they reduced his performance scores (as well as those of the other departing

employees) to avoid paying benefits and they concocted the position that his voluntary departure

was "cause."  ERISA does not provide for punitive damages, but if it did, this case would clearly

qualify based on the reprehensible evidence that the Company improperly used Mr. Cohen's 16-

plus years of statutorily-protected ERISA benefits as a weapon in its attempt to penalize

employees, including Mr. Cohen, who left Liberty Mutual to join Aspen.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Cohen respectfully requests that the Court grant his

motion for summary judgment, direct that Mr. Cohen's Plan benefits be restored and not

forfeited, and grant Mr. Cohen attorney's fees and costs, in accordance with ERISA Sections

502(a)(1)(B), (g)(1), 29 U.S.C. §§1132(a)(1)(B), (g)(1).[10]

Dated: New York, New York
        December 7, 2017

PAUL HASTINGS LLP

_____
By: Marc E. Bernstein

200 Park Avenue
New York, New York 10166
(212) 318-6000

---

[10] The courts ordinarily award attorney's fees and costs to prevailing claimants under ERISA, 29 U.S.C. §1132(g)(1), as it is well-established that "Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights."  Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 47 (2d. Cir. 2009); Salovaara v. Eckert, 222 F.3d 19, 28 (2d Cir. 2000) (the courts properly have a "favorable slant toward ERISA plaintiffs" in the awarding of fees).