# Exhibit 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

LIBERTY MUTUAL GROUP, INC., LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC. and LIBERTY SURPLUS INSURANCE CORPORATION,

                Plaintiffs,

-AGAINST-

ASPEN INSURANCE HOLDINGS LIMITED, ASPEN U.S. HOLDINGS, INC., ASPEN INSURANCE U.S. SERVICES, INC., ASPEN SPECIALTY INSURANCE COMPANY, ASPEN AMERICAN INSURANCE COMPANY, DAVID COHEN and DANIEL VAUGHN,

                Defendants.

Index No. _____/2015

Date Purchased: December 18, 2015

**SUMMONS**

Basis of Venue: CPLR § 503

---

**TO THE ABOVE NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer or, if the Complaint is not served with summons, to serve a notice of appearance, on the Plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
       December 18, 2015

                                            DEWEY PEGNO & KRAMARSKY LLP

                                            _____/s/ David S. Pegno_____
                                            David S. Pegno
                                            777 Third Avenue, 37th Floor
                                            New York, New York 10017
                                            (212) 943-9000

                                            *Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LIBERTY MUTUAL GROUP, INC., LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC. and LIBERTY SURPLUS INSURANCE CORPORATION,<br><br>      Plaintiffs,<br><br>- against-<br><br>ASPEN INSURANCE HOLDINGS LIMITED, ASPEN U.S. HOLDINGS, INC., ASPEN INSURANCE U.S. SERVICES, INC., ASPEN SPECIALTY INSURANCE COMPANY, ASPEN AMERICAN INSURANCE COMPANY, DAVID COHEN and DANIEL VAUGHN,<br><br>      Defendants. | Index No. _____<br><br><br><br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

   Plaintiffs Liberty Mutual Group, Inc., Liberty Mutual Insurance Company, Liberty Insurance Underwriters Inc. and Liberty Surplus Insurance Corporation (collectively "Liberty"), by their attorneys, Dewey Pegno & Kramarsky LLP, as and for their Complaint against Aspen Insurance Holdings Limited, Aspen U.S. Holdings, Inc., Aspen Insurance U.S. Services, Inc., Aspen Specialty Insurance Company, and Aspen American Insurance Company (collectively "Aspen"), David Cohen and Daniel Vaughn, allege, upon knowledge as to their own actions and upon information and belief as to the actions of others, as follows:

## **PRELIMINARY STATEMENT**

1. Liberty brings this action to address ongoing misconduct by a competitor and former Liberty senior executives.

2. On October 12, 2015, David Cohen—the President of LIU US (as defined below) and the Chief Underwriting Officer ("CUO") of LIU's Global Casualty group—announced his "retirement" from Liberty.

3. Just one week later, LIU US' Chief Operating Officer ("COO"), Daniel Vaughn, who reported to Cohen, abruptly resigned from Liberty, effectively immediately.

4. Cohen's "retirement" was short-lived: shortly after this last day as an employee of LIU US, he reemerged as the President and CUO of Aspen Insurance, one of Aspen's two underwriting units. Uncoincidentally, Vaughn also appeared at Aspen as Executive Vice President for Cohen's group.

5. This was not two senior employees coincidentally moving to the same competitor. To the contrary, Cohen's and Vaughn's appearances at Aspen were the first visible evidence of plans that had been ongoing for at least a month while Cohen served as the President of LIU US and Vaughn as COO of LIU US.

6. Despite his long-time role as one of the most senior employees at Liberty and his duty of loyalty to his employer, in late summer of 2015, Cohen began to plan with Aspen and Vaughn to move to Aspen and to take significant portions of Liberty's business opportunities and personnel with them.

7. Based on information about Liberty's business provided by Cohen to Aspen, Cohen, Vaughn and Aspen orchestrated to take senior members in key underwriting segments at LIU. Those senior employees included five of Cohen's then-direct reports.

2

8. In all, more than 20 Liberty employees, including several senior employees and virtually all underwriting staff in certain groups, have resigned and accepted employment with Aspen.

9. The timing of the raid was not coincidental. Much of the business written by the groups Defendants raided renews annually during the traditionally important renewal season at the end and beginning of the calendar year. Thus, Defendants' raid was timed to ensure that Liberty's former employees were in place and ready to move business to Aspen just in time for the 2016 renewal period.

10. Liberty brings this action to redress the significant harm that it has sustained and will continue to sustain as a result of the wrongful actions of its now former employees, which wrongful actions were accomplished with the active participation of their new employer, Aspen.

## THE PARTIES, JURISDICTION AND VENUE

*Liberty Mutual Group Plaintiffs*

11. Plaintiff Liberty Mutual Group, Inc. is a Massachusetts corporation with a principal place of business at 175 Berkeley Street, Boston, Massachusetts.

12. Plaintiff Liberty Mutual Insurance Company is a Massachusetts insurance company with a principal place of business at 175 Berkeley Street, Boston, Massachusetts.

13. Plaintiff Liberty Insurance Underwriters is an Illinois company with a principal place of business at 175 Berkeley Street, Boston, Massachusetts.

14. Plaintiff Liberty Surplus Insurance Corporation is a New Hampshire corporation with a principal place of business at 175 Berkeley Street, Boston, Massachusetts.

15.     Plaintiffs Liberty Mutual Group, Inc., Liberty Mutual Insurance Company, Liberty Insurance Underwriters Inc. and Liberty Surplus Insurance Corp. collectively operate under the name "Liberty Mutual Insurance."

16.     Liberty Mutual Insurance operates through four strategic business units. Liberty International Underwriters ("LIU") is a market segment of the strategic business unit called Global Specialty and offers specialty lines insurance globally through four regional divisions: LIU Canada, LIU Asia Pac, LIU US and LIU Latin America.

17.     The LIU US regional division operates in the admitted United States insurance market through multiple offices writing on Liberty Mutual Insurance Company and Liberty Insurance Underwriters Inc. LIU US writes specialty lines insurance in the surplus lines market through Liberty Surplus Insurance Corporation.

***The Aspen Defendants***

18.     Aspen Insurance Holdings Limited ("AHL") is a Bermuda holding company, listed on the New York Stock Exchange, with a principal place of business at the Maxwell Roberts Building, 1 Church Street, Hamilton, Bermuda. According to its public filings with the SEC, all Aspen entities named as defendants herein are indirect, wholly-owned subsidiaries of AHL.

19.     Aspen U.S. Holdings, Inc. is a Delaware corporation with a principal place of business at 175 Capital Boulevard, Rocky Hill, Connecticut. Aspen U.S Holdings is an indirect, wholly-owned subsidiary of AHL and a direct parent of all other Aspen entities named herein as defendants.

20.     Aspen Insurance U.S. Services, Inc. ("Aspen Services") is a Delaware corporation with a principal place of business at 175 Capital Boulevard, Rocky Hill, Connecticut. Aspen

Services is a wholly-owned subsidiary of Aspen U.S. Holdings, Inc. and an indirect, wholly-owned subsidiary of AHL. Aspen Services provides administrative services, including employment services, to the Aspen entities described below.

21. Aspen Specialty Insurance Company ("Aspen Specialty") is a North Dakota corporation with a principal place of business at 590 Madison Ave, New York, New York.

22. Aspen American Insurance Company ("AAIC") is a Texas corporation with a principal place of business at 590 Madison Ave, New York, New York. Upon information and belief, Aspen Specialty and AAIC serve as Aspen's main operating insurance companies in the U.S. and employ the individuals who have left Liberty for Aspen, as set out below.

*The Individual Defendants*

23. Cohen resides in the state of New Jersey. Cohen was the President of LIU US and the global CUO of LIU's Global Casualty group until he left LIU US on October 23, 2015. Cohen worked the office of LIU US in New York.

24. Vaughn resides in the state of New Jersey. Until he resigned from LIU US on October 19, 2015, Vaughn was the COO of LIU US reporting to Cohen. Vaughn worked in the office of LIU US in New York.

*Jurisdiction and Venue*

25. Jurisdiction and venue in this Court are proper because Aspen Specialty and AAIC are residents of New York, LIU has an office in New York where Cohen and Vaughn (collectively the "Individual Defendants") worked, all the defendants transacted business in New York, and a substantial part of the acts and omissions at issue occurred in New York.

## BACKGROUND

*The Individual Defendants' Employment at Liberty*

26. In 1999, Cohen was hired by Liberty to start up and run its United States casualty business. The group enjoyed substantial growth and success. In 2006, Cohen became the President of LIU US, which included operations in Latin America.

27. Vaughn was hired by Cohen as the head of operations for LIU US and worked closely with Cohen on day-to-day management of the business.

*Individuals Defendants' Contractual Commitments to Liberty*

28. While employed at Liberty, the Individual Defendants agreed to comply with the Code of Business Ethics and Conduct (the "Code of Conduct") as well as the Liberty Employee Handbook (the "Handbook").

29. Indeed, each year, as part of their compliance training, Liberty employees, including the Individual Defendants, annually recertified their agreements to comply with the Code of Conduct and the Handbook, and Cohen repeatedly emphasized this compliance training to the employees in his division.

30. Both the Code of Conduct and the Handbook contain relevant provisions concerning the use of confidential information belonging to Liberty.

31. The Code of Conduct, for instance, states that "we protect the confidential information we encounter at Liberty from unauthorized use or disclosure. We do not use or access such information for our own personal gain or when we don't have a business reason to do so." Liberty employees "have a responsibility to safeguard the information collected and used to support the Company's business from unauthorized disclosure."

32. It also provides that, "[o]ur innovative business practices and ideas are valuable and contribute directly to our profitability," and as such must be protected and continue to be protected after employment ends.

33. The Handbook similarly provides for the protection of confidential Liberty information. It states that Liberty "recognizes its obligation to treat employee information in a confidential manner" and requires employees to "safeguard" "confidential information" such as "non-public personal information of policy-holders and employees." It further states that Liberty employees "are prohibited from using or sharing any personal information obtained through [their] [Liberty] employment for personal gain or for the benefit of others."

34. Ostensibly, Cohen took compliance with Liberty's Handbook, Code of Conduct and other compliance processes very seriously. He took the unique step of requiring his direct reports and their teams to include an employee's adherence to compliance codes and processes as a performance objective, taking credit for this management tactic with senior leaders at Liberty.

***Cohen is Demoted, Plans a Move to Aspen and Solicits Liberty Employees, Including Vaughn***

35. In June 2015, Liberty appointed a new executive as Cohen's manager, inserting a tier of management between Cohen and the head of the Global Specialty strategic business unit that had not previously existed. From that point forward, Liberty reduced Cohen's responsibility to include only the US portion of LIU US' business. Cohen was displeased with these management changes and voiced his displeasure to LIU employees.

36. Cohen began to search for other opportunities for himself and key members of his team. He held discussions with Liberty's competitor, Aspen, about a role for himself and others from his Liberty team at Aspen. During this process, upon information and belief, Cohen

7

provided confidential and proprietary information to Aspen about various lines of business and personnel in which Aspen was interested.

37. Based on these discussions, Cohen solicited key Liberty employees to move to Aspen with him. While he was the President of LIU US, Cohen coordinated conversations between himself, his direct reports (who were the heads of key Liberty lines of business) and Aspen and its agent headhunter about moving to Aspen.

38. Among the employees that Cohen solicited was Vaughn. Cohen solicited him to assist in effectuating the planned raid of Liberty employees.

39. Cohen and Vaughn discussed with Aspen who from Liberty they could successfully solicit and what Aspen's needs were. Their assurances that desirable lines of business would move with them from Liberty to Aspen enabled them to obtain favorable offers from Aspen. In so doing, on information and belief, they used and/or disclosed confidential and proprietary Liberty information reflecting the reporting and operational structure, performance and strategies of particular business lines, as well as specific key information about Liberty personnel.

40. On October 12, 2015, Cohen announced that he would be retiring and set his last day as October 23, 2015. He did not return to the office after October 12, 2015.

41. On October 19, 2015, Vaughn resigned from Liberty, effective immediately. Upon information and belief, Vaughn resigned before Cohen started at Aspen so that he could lay the groundwork at Aspen for the ensuing raid of Liberty which, on information and belief, he had commenced doing while still employed at Liberty.

42. While he was still at Liberty and planning his move to Aspen, Cohen also directly solicited his long-time associate, Ruta Demereckas.

8

43. Furthermore, Cohen instructed Ms. Demereckas to continue to provide assistance to him even after his departure from Liberty—right through the time she left Liberty to join him *even though she was a Liberty employee and he was not*. For example, at Cohen's direction, she booked travel for him in his role at Aspen from her desk at Liberty.

44. On November 3, 2015, Ms. Demereckas resigned from Liberty, effective immediately, and joined Cohen at Aspen as he began his work there.

45. Unfortunately, Aspen has significant practice at raiding its competitors. Aspen raided Liberty's professional liability insurance group approximately five years ago, which occasioned Liberty's application, in this Court, for a temporary restraining order. Ironically, Vaughn submitted an affidavit in that case supporting Liberty's claim that Aspen had acted wrongfully in recruiting Liberty's employees, attesting that he is "very familiar with the nature of confidential and proprietary information and trade secrets used by and available to LIU employees."

46. Just recently, Aspen made headlines for its raid of XLCatlin's Singapore office.

***Aspen's Recent Raid of Liberty***

47. On November 2, 2015, the day before Cohen's role at Aspen was announced, the departures of other Liberty employees—which had been planned for weeks—began. That day the head of Environmental resigned. In the weeks that followed, senior members of the underwriting units of Excess Casualty, Railroad and Marine and Energy resigned. Those individuals promptly followed Cohen to Aspen.

48. Numerous Liberty employees who reported to the departed underwriting unit senior members followed, including nearly all the underwriting staff in certain business lines. For instance, on November 6, a few days after Cohen's arrival at Aspen, the head of LIU US'

9

Railroad department resigned. In a public statement, Aspen crowed about its acquisition not only of that single employee, but of the whole new department: This hire, Aspen announced, will "establish a railroad business line."

49. Within 2 weeks, Aspen "established" such a line, by raiding approximately half of LIU US' Railroad underwriters.

50. Of course, Aspen would not have been willing to bring on an entirely new business line without advance information about the strategy, profitability and employees in that line. Aspen would not have made such a mass hiring—greatly adding to its overhead—unless it knew it could quickly enter the Railroad market using a large part of Liberty's team and Liberty's confidential and proprietary information which would allow it to enter the business running. Only by using Liberty's personnel, strategies and relationships, and timing the raid to ensure quick transition of Liberty's Railroad customers around the new year, could Aspen take on an entirely new line with such little risk.

51. The Railroad group was not the only target for Aspen and Cohen. The senior members of the Excess Casualty line resigned from Liberty and, by November 10, many of the remaining employees in that group had moved from Liberty to Aspen.

52. In fact, by the time of this Complaint, the heads of four separate business lines had all resigned from Liberty and joined Cohen at Aspen.

53. And the raiding continues, with additional employees continuing to leave Liberty for Aspen.

**COUNT ONE**
**BREACH OF THE DUTY OF LOYALTY**
**(against the Individual Defendants)**

54. Plaintiffs repeat and reallege Paragraphs 1-53 as if fully set forth herein.

10

55. The Individual Defendants were senior employees of Liberty in whom Liberty reposed significant and unique trust.

56. The Individual Defendants owed Liberty a fiduciary duty and a duty of loyalty not to act in any manner inconsistent with their employment and to exercise good faith and loyalty in performing their duties.

57. The Individual Defendants breached their fiduciary duties and duties of loyalty to Liberty in numerous ways, including but not limited to by: using the confidential and proprietary information of Liberty to aid Aspen in its efforts to solicit and recruit employees of Liberty; planning with Aspen to solicit Liberty employees; planning to move and moving lines of business from Liberty to Aspen without Aspen paying for those businesses; and engaging in business activities on behalf of Aspen while still employed by Liberty.

58. These breaches caused damage to Plaintiffs in an amount to be determined at trial, plus related transaction costs, interest and fees.

### COUNT TWO
### AIDING AND ABETTING BREACH OF THE DUTY OF LOYALTY
(against Cohen and Aspen)

59. Plaintiffs repeat and reallege Paragraphs 1-58 as if fully set forth herein.

60. The Individual Defendants had duties of loyalty to Liberty which they breached by, among other things, providing confidential information about Liberty and Liberty employees to Aspen.

61. Despite its knowledge of the Individual Defendants' duties, Aspen knowingly and substantially assisted and induced the Individual Defendants' breaches of their duties of loyalty to Liberty by soliciting confidential information about Liberty and its employees for the benefit of Aspen while the Individual Defendants were still employed by Liberty.

11

62. Demereckas also had a duty of loyalty to Liberty, which she breached, including as set forth above in Paragraph 43.

63. Although they knew of her obligations as an active employee of Liberty, Cohen and Aspen knowingly and substantially assisted and induced Demereckas's breaches of her duties of loyalty by engaging her on business for Aspen while she was still employed by Liberty.

64. Aspen has knowingly and substantially profited from the Individual Defendants' breaches of their duties of loyalty to Liberty. Cohen and Aspen have knowingly and substantially profited from Demereckas's breach of her duties of loyalty to Liberty.

65. These breaches caused damage to Plaintiffs in an amount to be determined at trial, plus related transaction costs, interest and fees.

## COUNT THREE
## BREACH OF CONTRACT
### (against the Individual Defendants)

66. Plaintiffs repeat and reallege Paragraphs 1-65 as if fully set forth herein.

67. The Code of Conduct and the Handbook, which require adherence to certain conditions of employment, seek to protect Liberty's confidential and proprietary information, customer and relationships with its employees, and goodwill.

68. The Individual Defendants agreed, as a condition of their employment, to abide by the Code of Conduct and the Handbook, and they confirmed their adherence to these conditions every year in an annual certification process.

69. Liberty substantially performed its duties and obligations under the Code of Conduct and the Handbook.

70. The Individual Defendants breached their obligations under the Code of Conduct and the Handbook by, upon information and belief, utilizing Liberty's confidential and

proprietary information for purposes contrary to the interests of Liberty and for the benefit of Aspen, including for the solicitation of Liberty employees and the unauthorized acquisition of Liberty lines of business.

71. The Individual Defendants' breaches were neither justified nor excused.

72. These breaches caused damage to Plaintiffs in an amount to be determined at trial, plus related transaction costs, interest and fees.

## COUNT FOUR
## TORTIOUS INTERFERENCE WITH CONTRACT
### (against Aspen)

73. Plaintiffs repeat and reallege Paragraphs 1-72 as if fully set forth herein.

74. The Code of Conduct and the Handbook, to which the Individual Defendants agreed as a term of their employment, constituted valid and enforceable agreements.

75. Aspen knew of the existence and terms of these agreements.

76. Aspen has knowingly, intentionally, improperly, tortiously and in bad faith caused or aided the Individual Defendants' breaches of the Code of Conduct and the Handbook as set forth above.

77. The Individual Defendants have in fact breached the Code of Conduct and the Handbook as set out above, and Plaintiffs have been damaged by such breaches.

78. Aspen has undertaken the tortious conduct set out herein and secured or induced breaches of the Code of Conduct and the Handbook without claim of right or privilege, and has substantially profited thereby.

79. Defendants' tortious interference with the Code of Conduct and the Handbook has caused damage to Plaintiffs in an amount to be determined at trial, plus related transaction costs, interests and fees.

## COUNT FIVE
## RAIDING/UNFAIR COMPETITION
### (against Aspen)

80. Plaintiffs repeat and reallege Paragraphs 1-79 as if fully set forth herein.

81. Upon information and belief, Aspen used dishonest and unfair means to gain access to confidential and proprietary information belonging to Liberty, including but not limited to information about specific Liberty employees and the internal structure and performance of Liberty's business.

82. Aspen then, in bad faith, used that confidential and proprietary information, including information about Plaintiffs' corporate structure and its employees, to lure away over 20 Liberty employees.

83. Liberty has suffered damages as a result of the unfair competition by Aspen in an amount to be determined at trial, plus related transaction costs, interest and fees.

## COUNT SIX
## UNJUST ENRICHMENT
### (against Aspen)

84. Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

85. Aspen was enriched by its misappropriation and use of Liberty's confidential, proprietary information including but not limited confidential information related to Liberty's internal structure and personnel.

86. This information was obtained improperly and at Liberty's expense.

87. Equity and good conscience militate against permitting Aspen to retain the benefits of the confidential, proprietary and trade secret information belonging to Liberty.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for relief and judgment as follows:

A.  Ordering the Individual Defendants to return to Liberty all compensation earned during the period of or in connection with their disloyalty to Liberty;

B.  Awarding compensatory damages in favor of Plaintiffs for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but in no event less than millions of dollars plus related transaction costs, interest, fees and litigation costs;

C.  Immediately and permanently enjoining Defendants' use of Plaintiffs' confidential and proprietary information, and Defendants' use of unfair and dishonest trade practices; and

D.  Any other and further relief the Court deems just and proper.

Dated: New York, New York
       December 18, 2015

DEWEY PEGNO & KRAMARSKY LLP

By: /s/ David S. Pegno
    David S. Pegno
    Ariel P. Cannon
    Briahna Gray
777 Third Avenue
New York, New York 10017
(212) 943-9000

*Attorneys for Plaintiffs*