UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                    :

DAVID COHEN,              :
                    :

          Plaintiff,   :

                    :

      -v-           :

                    :

LIBERTY MUTUAL GROUP INC.  :
EXECUTIVE PARTENRSHIP DEFERRED  :
COMPENSATION PLAN and LIBERTY  :
MUTUAL GROUP INC. 2012 EXECUTIVE  :
PARTNERSHIP PLAN,  :
                    :

         Defendants.  :
                    :

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ____3/31/2019____

16-CV-9295 (VSB)

**OPINION & ORDER**

Appearances:

Marc E. Bernstein (New York, NY)
Stephen Henry Harris (Los Angeles, CA)
Paul Hastings LLP
*Counsel for Plaintiff*

Nancy G. Ross
Richard E. Nowak
Mayer Brown LLP
Chicago, IL
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff David Cohen ("Plaintiff") brings this action, pursuant to § 502(a)(1)(B) of the

Employee Retirement Income Security Act of 1974 ("ERISA") against Defendants Liberty

Mutual Group Inc. Executive Partnership Deferred Compensation Plan ("EPDCP") and Liberty

Mutual Group Inc. 2012 Executive Partnership Plan ("EPP" and, collectively, "Defendants" or

the "Plans"), seeking review of Defendants' adverse benefits determination. Before me are the

parties' cross-motions for summary judgment. Because Defendants' adverse benefits

determination was without reason and unsupported by substantial evidence, Plaintiff's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.

## I.    **Background**

The EPP and EPDCP are employee benefits plans sponsored by Liberty Mutual Group Inc. ("Liberty Mutual" or the "Company"). (EPP §§ 1, 2.9, 14; EPDCP §§ 1, 2.10; *see also* Pl.'s 56.1 Resp. ¶¶ 10–13.)[1]  As the plan administrator for the EPP and EPDCP, Liberty Mutual both evaluates and pays benefit claims. (EPP §§ 2.1, 2.9; EPDCP §§ 2.1, 2.10; Foley Dep. 89:22-90:2.)[2]  Under the EPP, eligible executives participate in the increase in Liberty Mutual Holding Company Inc.'s enterprise value. (*See* Pl.'s 56.1 Resp. ¶ 13.)  Under the EPDCP, eligible executives receive deferred compensation. (*Id.* ¶ 11.)  Plaintiff was employed at Liberty Mutual for approximately sixteen years, beginning in 1999, and he was a participant in both the EPP and EPDCP during that time. (Defs.' 56.1 Resp. ¶¶ 2, 15.)[3]

From 2014 to 2015, Liberty Mutual began restructuring the division in which Plaintiff worked, Liberty International Underwriters ("LIU"). (Admin. R. 771.)  In connection with that restructuring, "Liberty Mutual retained the global management consulting firm Oliver Wyman to

---

[1] "EPP" refers to the Liberty Mutual Group Inc. 2012 Executive Partnership Plan, Effective January 1, 2012, a copy of which can be found on pages 14–24 of the Administrative Record. "EPDCP" refers to the Liberty Mutual Group Inc. Executive Partnership Deferred Compensation Plan (as Amended and Restated, effective January 1, 2012), a copy of which can be found on pages 26–39 of the Administrative Record. "Administrative Record" or "Admin. R." refers to the complete Administrative Record, which is attached as Exhibit A to the Bernstein Declaration, dated December 7, 2017. (Docs. 72-2–72-27.) "Bernstein Declaration" or "Bernstein Decl." refers to the Declaration of Marc E. Bernstein in Support of Plaintiff's Motion for Summary Judgment, dated December 7, 2017. (Doc. 72.) "Pl.'s 56.1 Resp." refers to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts, dated January 8, 2018. (Doc. 77.) I refer to this document because it consolidates Defendant's Local Rule 56.1 Statement of Undisputed Facts, (Doc. 70), and Plaintiff's responses and objections to the facts asserted therein.

[2] "Foley Dep." refers to the Deposition of Melanie Foley, dated July 13, 2017, which is attached as Exhibit D to the Bernstein Declaration. (Docs. 72-30–72-40.)

[3] "Defs.' 56.1 Resp." refers to Defendant's Objections and Responses to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, January 8, 2018. (Doc. 79.) I refer to this document because it consolidates Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts, (Doc. 70), and Defendant's responses and objections to the facts asserted therein.

conduct a six-week analysis of the current and potential future organizational structures for LIU." (Pl.'s 56.1 Resp. ¶ 35; *see also* Nowak Decl. Ex. 8.) During late 2015, unbeknownst to Plaintiff, Liberty Mutual employees exchanged emails discussing a plan to terminate Plaintiff's employment by offering him a retirement package, including one year of severance pay, and they even prepared a script to read to him. (*See* Bernstein Decl. Exs. G–L.) Liberty Mutual intended to terminate Plaintiff's employment without cause. (*See* Defs.' 56.1 Resp. ¶ 9 (conceding that in October 2015 "Liberty Mutual did not intend to terminate Plaintiff's employment for cause").) Pursuant to this plan, Liberty Mutual intended to inform Plaintiff on October 15, 2015 that his position had been eliminated and his employment would be terminated, effective immediately. (*See* Bernstein Decl. Ex. I.) However, on October 12, 2015, three days before Liberty Mutual intended to terminate his employment, Plaintiff—who was unaware of Liberty Mutual's plans— gave Liberty Mutual notice that he would voluntarily resign, effective two weeks later, on October 26, 2015. (Defs.' 56.1 Resp. ¶ 9.)

Shortly after Plaintiff's departure from Liberty Mutual, he began employment at one of Liberty Mutual's competitors, Aspen Insurance Services U.C. Inc. ("Aspen"). (*Id.* ¶ 16.) At approximately the same time, several other people resigned from Liberty Mutual and began employment at Aspen. (*Id.* ¶ 17.)

### A. *The Connolly Letter*

Approximately two months after Plaintiff's departure from Liberty Mutual, on December 23, 2015, Mary Connolly, a Liberty Mutual employee responsible for Employee Relations and HR Services, sent a letter to Plaintiff (the "Connolly Letter"). (Admin. R. 11–12.) The body of the Connolly Letter contained only two sentences: "As a result of information uncovered after your voluntary resignation on October 25, 2015, we are reclassifying your termination from a

voluntary resignation to a termination for cause. As a result, provisions will change under Compensation and Benefits Plans which you participated in as outlined in the attached document." (*Id.* at 11.) Under the heading "EPP/EPDCP," the document attached to the Connolly Letter stated: "In the event of termination for 'cause', participant forfeits all vested and unvested units in the Plan. As a result of termination for cause, $971,500 of vested units and investment fund value and $299,125 of unvested units has [*sic*] been forfeited." (*Id.* at 12.)

On January 15, 2016, Plaintiff responded to the Connolly Letter. (*Id.* at 285–86.) Plaintiff's response, which was addressed to "Plan Administrator[,] Liberty Mutual [EPP] and [EPDCP]," expressed that he was shocked to learn that his termination had been reclassified and that Liberty Mutual had determined to forfeit his benefits. (*Id.* at 285.) Pursuant to 29 C.F.R. §§ 2560.503-1(h)(2)(ii), (i)(5), and (m)(8), and 29 C.F.R. § 1024(b)(4), Plaintiff requested several documents to assist in his "decision as to whether to dispute the adverse benefit determinations set forth in [the Connolly Letter]," including: "any and all documents, records and other information that were relied upon in determining to reclassify [his] resignation to a termination for 'cause'"; "identification of the specific sections of the Plan on which the adverse benefit determination was based"; and "identification of the individual or individuals who made the determination to reclassify [his] resignation to a termination for cause." (*Id.*) In an email, Ms. Connolly apparently offered to send documents to Plaintiff on or before March 15, 2016.[4] (*Id.* at 291.) Plaintiff reiterated his request on February 2, 2016, reminding Ms. Connolly of Liberty Mutual's obligation, pursuant to 29 U.S.C. § 1132(c)(1), to provide the documents no later than February 14, 2016 (i.e., within thirty days of his request). (*Id.*) He informed Ms.

---

[4] Ms. Connolly's email response is not in the Administrative Record, but Plaintiff refers to the response in a letter dated February 2, 2016. (Admin. R. 291.) It is not clear why the email has been omitted from the Administrative Record.

Connolly that the documents were necessary to his "appeal of the adverse benefits determinations set forth in [the Connolly Letter]." (*Id.*) On February 11, 2016, Ms. Connolly provided Plaintiff with "plan documents and summaries." (*Id.* at 293.)

On February 19, 2016, without the benefit of many of the documents he requested, including any documents related to the reclassification of his resignation to termination for cause, Plaintiff formally appealed the December 23, 2015 adverse benefits determination in the Connolly Letter ("February 19 Appeal"). (*Id.* at 2–356.) The February 19 Appeal criticized the Connolly Letter and subsequent communications from Liberty Mutual "because none of the Plans' Administrators (i) provided [Plaintiff] with the specific reasons or facts underlying their initial adverse benefit determinations or (ii) provided [Plaintiff] with reference to the specific Plan provisions on which such determinations were made." (*Id.* at 5–6.) The February 19 Appeal also asserted that Plaintiff "did not engage in any conduct during his employment that would fall under any reasonable definition of the word [cause]." (*Id.* at 6.)

## B. *The Andrews Letter*

Three months later, on May 19, 2016, Lori Andrews, the Vice President of Talent & Enterprise Services at Liberty Mutual, sent Plaintiff a letter in response to the February 19 Appeal ("Andrews Letter"). (*Id.* at 357–61.) The Andrews Letter recharacterized the February 19 Appeal as an "initial claim for benefits under the Plans." (*Id.* at 357.) Ms. Andrews stated that, pursuant to the authority granted to her by the Plans to "'construe and interpret the terms' of the EPP [and EPDCP]," Plaintiff was not eligible for benefits because Liberty Mutual had notified him that "his termination was classified as a termination for cause." (*Id.* at 357–59.) The Andrews Letter stated that Ms. Andrews had "reviewed [Liberty Mutual's] reasons" for reclassifying [Plaintiff's] departure as a termination for cause" and that the "[t]he circumstances

surrounding [Plaintiff's] departure and their resulting disruption to the Company's business provide ample evidence that [Liberty Mutual] acted in good faith." (*Id.* at 358.) The Andrews Letter did not provide any additional details concerning the reasons for the reclassification of his resignation. The Andrews Letter identified §§ 7.5 and 9 of the EPP and § 8.5 of the EPDCP as the sections pursuant to which Plaintiff's benefits had been denied. (*Id.* at 358–59.) The letter also instructed that, if Plaintiff wishes to submit "a petition for review," such petition must be delivered to "Melanie Foley, Executive Vice President, Chief Talent and Enterprise Services Officer." (*Id.* at 360.)

Plaintiff responded to the Andrews Letter one week later, on May 26, 2016. (*Id.* at 361–64.) Having still not received many of the documents and information he requested in his January 15, 2016 letter, Plaintiff reiterated his requests, noting that it was his fifth request for the documents, and Plaintiff reminded Liberty Mutual of its obligation under the United States Department of Labor's ERISA claims-procedure regulation ("ERISA Procedures Regulation"), 29 C.F.R. § 2560.503-1, to provide the materials he had requested. (*See* Admin. R. 361–64 (citing 29 C.F.R. §§ 2560.503-1(h)(2)(ii), (i)5, (m)(8), (b)(5).) In response to the Andrews Letter's vague statements regarding the reasons for the reclassification of Plaintiff's resignation as a termination for cause, Plaintiff also requested additional documents, such as "[a]ny and all correspondence between [Liberty Mutual] and the plan administrators of the Plans pertaining to [Plaintiff's] termination," "documents, records and other information pertaining to [Ms. Andrews'] review of '[Liberty Mutual's] reasons for classifying [Plaintiff's] departure as a termination for cause,'" and "documents, records and other information pertaining to the 'circumstances surrounding [Plaintiff's] departure and their resulting disruption to [Liberty Mutual's] business.'" (*Id.* at 362–63.)

On June 23, 2016, Ms. Andrews sent a letter ("Andrews Follow-Up Letter") in response to Plaintiff's May 26, 2016 letter, and stated that she was attaching the requested documents "to the extent they fall within the plan administrator's obligations, the documents exist, and the documents have not previously been produced to [Plaintiff]." (*Id.* at 868–69.) The Andrews Follow-Up Letter attached a document that appears to be a printout from Liberty Mutual's human resources portal for Plaintiff, stating that the "Leaving Reason" is "Co Initiated-Policy Violation." (*Id.* at 873.) The Andrews Follow-Up Letter also attached handwritten notes that appear to have been taken on May 3, 2016 ("May 3 Notes"), (*id.* at 871–72), and May 12, 2016 ("May 12 Notes"), (*id.* at 870).[5] The Andrews Follow-Up Letter did not attach any documents that preceded the December 23, 2015 Connolly Letter. It is difficult to determine from the face of the May 3 Notes who took them or where they were taken, and the Andrews Follow-Up Letter did not identify whose notes were being produced. The May 3 Notes include several names at the top: "Brendan, Malik, Nancy Ross +2 (Nick & Stephanie Gonsalves)[,] Nancy Keating," and they include the question, "What lead [*sic*] to the reclassification to term for cause[?]" (*Id.* at 871.)[6] In apparent response to that question, the notes state, "2015 performance related to legacy reserving & shrinking[.] LOB that had grown irresponsibly – not cat losses more reducing LOB & hemorraging [*sic*] & see Incentive results – attrib to David C. leadership, not cat related w/out [indecipherable] had a loss; 10% of planned PTOI." (*Id.* at 871.) The May 3 Notes also state, "Cohen did not accept actuaries reserving judgment & indication on reducing LOB exposure;

---

[5] The May 3 and May 12 Notes are in the Administrative Record, but the copies are of low quality and are difficult to read. More legible copies of the notes are attached as Exhibit BB to the Bernstein Declaration. (Doc. 72-71.) The Andrews Follow-Up Letter appears to have also attached several other documents. These documents contain general information about the EPP and EPDCP, but none of them addresses the reclassification of Plaintiff's resignation as a termination for cause. (*See* Admin. R. 874–1088.)

[6] Some of these names are redacted in the Administrative Record, but they are included in the version of the notes that was attached as Exhibit BB to the Bernstein Declaration.

Cohen felt actuaries were exaggerating cost"; "Cohen 'retired' & then Vaughn resigned, exodus began w/ some disclosing & other not"; "over 4–6 weeks, 25 people left to go to Aspen"; "financial damage pre-leaving; & damage, & havoc"; "staff loss in waves"; "term for cause related to his leaving & taking all those people & doing severe damage to our business." (*Id.* at 872.)

The May 12 Notes state at the top, "Met w/ Chris, Lisa Pereira took notes; LBA added based on meeting content." (*Id.* at 870.) It appears, therefore, that one person took the notes, and Ms. Andrews later revised them. The notes are titled, "Chris P. – LIU US Impact to Business." (*Id.*) Those notes included the following statements: "DC Leaving and direct solicitation is concern"; "emergency summit in NY[,] . . . brought all global people together to figure out how to address staff loss"; "DC – 3rd party business"; "market perception/reaction"; "Insurance 'insider' – Regular stories on poaching – impacted mkt perception"; and "*DC leaving & taking so many team members* demanded significant & *immediate* attention from mgmt. to preserve and keep the business".[7] (*Id.*)

## C. *The Foley Letter*

On July 21, 2016, Plaintiff formally appealed to Ms. Foley the determinations made in the Andrews Letter ("July 21 Appeal"). (*Id.* 365–799.) Among other reasons for his appeal, Plaintiff argued that the Andrews Letter "[did] not define . . . the meaning of the term 'cause' under either [the EPP or EPDCP], nor [did it] identify any specific conduct by [Plaintiff] to support her decision, other than vague and unspecified references to 'circumstances' and 'disruption.'" (*Id.* at 367.) Plaintiff also noted that under the terms of both Plans, a

---

[7] Based upon the noticeable difference in handwriting, the italicized phrases in this note appear to have been added after the original notes were taken.

reclassification required "'*evidence* . . . after employment termination that a Participant acted or failed to act in such a manner that would have provided grounds for a 'cause' termination[,]'" and argued that the Andrews Letter did not "specify -- or even address -- what evidence supposedly justified the reclassification of [Plaintiff's] retirement as a termination for cause." (*Id.* at 368 (quoting EPP § 7.5 and EPDCP § 8.5).)  Plaintiff argued that this omission was a violation of the Plans, which require a denial of benefits to include the "specific reasons for such denial."  (*See id.* (citing EPP § 13.2(a) and EPDCP § 17.2(a)).)

        The July 21 Appeal also asserted that Plaintiff had not engaged in any conduct constituting "cause" under any reasonable definition of the term.  (*Id.*)  Plaintiff attempted to address the apparent reasons for the reclassification that were stated in the May 3 and May 12 Notes, such as "term for cause related to his [Cohen] leaving and taking all those people and doing severe damage to our business" and "DC leaving and taking so many team members demanded significant immediate attention from mgmt."  (*Id.*)  Plaintiff interpreted those notes to "presumably refer[] to the other employees who left [Liberty Mutual] after [Plaintiff] left[,]"  (*id.* at 369), and he responded that he "did not recruit or solicit any [Liberty Mutual] employees -- either during or after his retirement from [Liberty Mutual]."  (*Id.*)  In support of this assertion, Plaintiff attached to the July 21 Appeal an affidavit from himself and thirty-one additional affidavits—one from each of the Liberty Mutual employees who joined Aspen in the period following Plaintiff's retirement.  (*See id.* 747–83.)  The July 21 Appeal criticized the Plans' administrators for failing to provide several documents that he had requested related to the reclassification.  (*Id.* at 371.)  Additionally, he requested the "names of every individual employed by [Liberty Mutual] whom [Plaintiff] allegedly solicited or recruited, and any and all documents or other information supporting that incorrect speculation."  (*Id.* at 372.)

On September 15, 2016, Ms. Foley sent a letter response to Plaintiff's July 21 Appeal ("Foley Letter"). (*Id.* at 800–67.) The Foley Letter identified the provisions of the Plans under which Plaintiff's benefits were denied—§§ 7.5 and 9 of the EPP and § 8.5 of the EPDCP—and explained that "when [Liberty Mutual] . . . makes the determination that an employee's behavior warrants a termination for cause, benefits under the two plans are forfeited. The plans do not authorize the plan administrators to override that decision." (*Id.* at 801.) Ms. Foley stated that she had "further investigated the circumstances giving rise to the termination for cause[,]" and that she had spoken with the "[Liberty Mutual] officers who made or were involved in the decision," although she did not identify them. (*Id.*) She also stated that she "reviewed evidence supporting their concerns with the business disruption and tainted [Liberty Mutual] reputation caused by [Plaintiff's] departure," although she did not attach, identify, or explain the evidence she reviewed or the nature of the disruption or reputational damage. (*Id.*) Ms. Foley concluded that "sufficient evidence supports [Liberty Mutual's] decision". (*Id.*)

Ms. Foley asserted that Plaintiff's departure was not reclassified "based solely on the substantial number of employees that joined him at his subsequent employer[;]" rather, it was "based on evidence of the overall disruption and harm to the business caused by [Plaintiff]," but it did not explain "the overall disruption and harm" that Plaintiff caused, or how Plaintiff's conduct that allegedly led to that disruption and harm qualified as misconduct that could lead to a reclassification of a resignation as a termination for cause. (*Id.*) Ms. Foley stated that Plaintiff's "contention that the plan administrator must provide evidence to justify the reclassification" was "misfocused," based on Ms. Foley's interpretation of § 7.5 of the EPP and § 8.5 of the EPDCP. (*Id.*) Finally, Ms. Foley explained that Plaintiff had the right to bring a civil action under § 502(a) of ERISA within one year of the Foley Letter. (*Id.* at 804.)

## II.   **Procedural History**

Plaintiff commenced this action on December 1, 2016.  (Doc. 1.)  On December 19, 2016, Plaintiff filed an amended complaint.  (Doc. 19.)  On February 15, 2017, the parties appeared for a conference, during which I ordered that certain limited discovery could be taken. (Doc. 27.)  On December 7, 2017, after the competition of discovery, Plaintiff filed a motion for summary judgment, (Doc. 65), along with a memorandum of law in support, (Doc. 67), a Rule 56.1 Statement, (Doc. 66), and a declaration with exhibits, (Doc. 72).  On the same day, Defendants filed a cross-motion for summary judgment, (Doc. 68), a memorandum of law in support, (Doc. 71), a Rule 56.1 Statement, (Doc. 70), and a declaration with exhibits, (Doc. 69). On January 8, 2018, the parties filed their opposition briefs, (Docs. 76, 78), and their counterstatements to the Rule 56.1 Statements, (Docs. 77, 79).  Defendants also submitted another declaration with one exhibit in support of their motion.  (Doc. 80.)

## III.   **Legal Standard**

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at

256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)). "[W]hen both parties move for

summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.* (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

"It is appropriate for courts reviewing a challenge of denial of benefits under ERISA to do so on a motion for summary judgment, which 'provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record.'" *Ramsteck v. Aetna Life Ins. Co.*, No. 08-CV-0012 (JFB)(ETB), 2009 WL 1796999, at *6 (E.D.N.Y. June 24, 2009) (quoting *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160(JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007)). "In such an action the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA." *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07 Civ. 9661(GEL), 2009 WL 222351, at *12 (S.D.N.Y. Jan. 30, 2009) (internal quotation marks omitted).

## IV. Discussion

### A. *Standard of Review*

#### 1. Applicable Law

ERISA provides that a person denied benefits under an employee benefits plan may challenge that denial in federal court. *See* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . to recover benefits due to [the plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ."). To proceed with a claim in federal court, a party must first exhaust administrative remedies. *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993).

Exhaustion consists of "only those administrative appeals provided for in the relevant plan or policy." *Id.*

ERISA itself "does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Fay*, 287 F.3d at 103 (quoting *Zuckerbrod v. Phx. Mut. Life Ins. Co*., 78 F. 3d 46, 49 (2d Cir. 1996)). Instead, "substantive ERISA law determines the proper standard of review that the Court should apply in reviewing the decision of the plan administrator." *Gannon*, 2007 WL 2844869, at *6.

The Supreme Court has held that "denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Fay,* 287 F. 3d at 103 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Where a plan grants the administrator discretionary authority to determine eligibility benefits, the court may use a deferential standard of review. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008). Even where a plan grants the administrator such authority, a court will conduct de novo review of a claim if a plan fails "to comply with the Department of Labor's claims-procedure regulation . . . unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent *and* harmless." *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 45 (2d Cir. 2016) (citing 29 C.F.R. § 2560.503-1).

## 2. Application

The undisputed grant of discretion under both Plans to determine eligibility for benefits or to construe the terms of the plan, (*see* EPP § 2.9; EPP § 2.10), directs that I should adopt a

deferential standard of review, *see McCauley*, 551 F.3d at 132, unless the Plans failed "to comply with the Department of Labor's claims-procedure regulation." *Halo*, 819 F.3d at 45. Plaintiff argues that the Connolly Letter was an "adverse benefits determination" under the ERISA Procedures Regulation, and that the Connolly Letter's failure to strictly adhere to that regulation compels de novo review under *Halo*. (*See* Pl.'s Mem. 17–19.)[8] Defendants argue that "Ms. Connolly was not acting on behalf of the Plans," and that the Connolly Letter could not have been an adverse benefits determination because it was not preceded by an affirmative claim from Plaintiff. (Defs.' Opp'n 4–8.)[9]

Defendants' argument lacks merit and is contracted by the Connolly Letter itself. In short, Defendants argue that a letter notifying Plaintiff that Liberty Mutual had determined that his benefits would be terminated was not an adverse benefits determination. I find that Defendants' reading of the letter is simply not credible since the letter explicitly referenced that Plaintiff's benefits are being terminated because the termination of his employment was reclassified to be for cause.

Defendants' argument that "Ms. Connolly was not acting on behalf of the Plans" is equally unpersuasive. First, nowhere in the letter does Ms. Connolly state that she was not acting on behalf of the Plans, or that she was acting in some other capacity. Second, Ms. Connolly explicitly discussed in the letter an action taken that negatively impacted Plaintiff's benefits. Specifically, the Connolly Letter states that Plaintiff's termination was being reclassified "from a voluntary resignation to a termination for cause," resulting in the change in

---

[8] "Pl.'s Mem." refers to the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, dated December 7, 2017. (Doc. 67.)

[9] "Defs.' Opp'n" refers to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, dated January 8, 2018. (Doc. 78.)

his compensation and benefits outlined in the attached document, which, in turn, stated that "[i]n the event of termination for 'cause', participant forfeits all vested and unvested units in the Plan. As a result of termination for cause, $971,500 of vested units and investment fund value and $299,125 of unvested units has [*sic*] been forfeited."  (Admin. R. 12.)

With regard to the need for Plaintiff to have made an affirmative claim for benefits, Defendants do not cite a single case in which a court has found that an affirmative claim must precede an adverse benefits determination, and they fail to adequately distinguish the case on which Plaintiff relies, *Infantolino v. Joint Industry Board of the Electrical Industry*, No. 06-CV-00520 (JG), 2007 WL 879415, at *5 (E.D.N.Y. Mar. 15, 2007).  In *Infantolino*, the court rejected a similar argument because an adverse benefits determination "includes termination of a benefit . . . 'including any such termination of, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in the plan.'" *Id.* at *5 (quoting 29 C.F.R. § 2560.503-1(m)(4)).  Under the terms of the Plans, the administrator was Liberty Mutual, (*see* EPP § 2.1, 2.9; EPDCP §§ 2.1, 2.10), and therefore Plaintiff could reasonably construe any communication from Liberty Mutual—here from a Liberty Mutual employee with the title VP and Manager, Employee Relations and HR Services—related to the forfeiture of his benefits as an adverse benefits determination under the Plans.

Moreover, under the language of the Plans themselves, the Connolly Letter was obviously an action taken pursuant to the Plans.  Section 7.5 of the EPP and § 8.5 of the EPDCP (the "For-Cause Sections") contain almost identical language:

> Notwithstanding any other provision . . . , if [Liberty Mutual] . . . terminates a Participant's employment for "cause", [Liberty Mutual] shall immediately forfeit all of such Participant's [benefits] regardless of whether such awards had previously become vested . . . .  In the event that evidence is acquired after employment termination that a Participant acted or failed to act in such a manner that would have provided grounds for a 'cause' termination, then [Liberty Mutual]

shall have the right to immediately forfeit any then outstanding [benefits] and/or recover any amounts received (determined on a before-tax basis) by such Participant . . . .

The first sentence of the For-Cause Sections contemplates a circumstance in which a plan participant's employment is terminated for cause by Liberty Mutual. It is undisputed that this sentence does not apply to Plaintiff, because Liberty Mutual did not terminate his employment; he terminated his own employment when he voluntarily resigned. Accordingly, Plaintiff's benefits must have been denied pursuant to the second sentence, which addresses the circumstance where Liberty Mutual purportedly acquired evidence that could have supported the termination of Plaintiff's employment for cause. In this circumstance, Liberty Mutual has "the right to immediately forfeit" claimant's benefits. (EPP § 7.5; EPDCP § 8.5.) Defendants, who argue that the Connolly Letter was an employment action and not an action taken pursuant to the Plans, (*see* Defs.' Mem. 1; Defs.' Opp'n 2), have identified no company policy, independent from the Plans, under which an employee's departure may be reclassified. Accordingly, the Connolly Letter is appropriately construed as a determination that, because the conditions of the second sentence had purportedly been satisfied, Liberty Mutual had the discretion (i.e., the "right") to forfeit Plaintiff's benefits, and that Liberty Mutual was indeed exercising that discretion to terminate Plaintiff's benefits under the Plans. *See* 29 C.F.R. § 2560.503-1(m)(4) (defining "adverse benefit determination" as a "termination of . . . a benefit, including any such . . . termination . . . that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan"). If the denial of benefits under the Plans were automatic and mandatory, the second sentence would have read something like the following: "In the event that evidence is acquired after employment termination that a Participant acted or failed to act in such a manner that would have provided grounds for a 'cause' termination and [Liberty Mutual] reclassifies the

Participant's termination as a termination for cause, then [Liberty Mutual] must immediately forfeit any then outstanding [benefits] and/or recover any amounts received (determined on a before-tax basis) by such Participant."

The ERISA Procedures Regulation requires that an adverse benefits determination notify a plan participant of: (1) "[t]he specific reason or reasons for the adverse determination"; (2) "the specific plan provisions on which the determination is based"; and (3) "the plan's review procedures and the time limits." 29 C.F.R. § 2560.503-1(g)(1); *see also* 29 U.S.C. § 1133(1) (requiring that Plans provide notice "setting forth the specific reasons" for a benefits denial). The Connolly Letter provided only vague reasons for the denial, it did not identify any provision of the EPP or EPDCP under which the benefits were terminated, and it did not include information about the review procedures and time limits. (*See* Admin. R. 11–12). Therefore, it failed to comply with the ERISA Procedures Regulation and de novo review would typically be appropriate. *Halo*, 819 F.3d at 45.

In the alternative, Defendants argue that, notwithstanding the Connolly Letter's failure to comply with the ERISA Procedures Regulation, I should still review the denial of Plaintiff's benefits under an arbitrary-and-capricious standard because "any noncompliance with ERISA's claims procedures was inadvertent and harmless." (*See* Defs.' Opp'n 9 (relying on *Halo*, 819 F.3d at 57–58).) They argue that Ms. Connolly had no reason to believe that her letter would be construed as an adverse benefits determination, so it was inadvertent, and Plaintiff was able to access the Plans' ERISA-compliant procedures after he submitted the February 19 Appeal, so ultimately the Connolly Letter's noncompliance was harmless. (*Id.*) As discussed above, the language of the letter itself demonstrates that it constituted an adverse benefits determination, and so it would be unreasonable for Ms. Connolly to believe that the requirements of the ERISA

Procedures Regulation did not apply. Moreover, Defendants' argument misconstrues the Second Circuit's instructions that should be applied cases such as this one.

In *Halo*, the Second Circuit abandoned a standard under which a Plan's failure to comply with the ERISA Procedures Regulation would be excused "if the record otherwise shows that the plan 'substantially complied' with the regulation's requirements," *Halo*, 819 F.3d at 47, 57 ("Accordingly, we reject the substantial compliance doctrine[.]"), and instead adopted a standard under which a court should conduct de novo review any time a plan fails "to comply with the Department of Labor's claims-procedure regulation," unless that failure "was inadvertent *and* harmless," *id.* at 45. However, in establishing the new standard, the Second Circuit was careful to circumscribe the exception to "prevent the exception from swallowing the rule," and it directed that deviations from the ERISA Procedures Regulation "should not be tolerated lightly[,]" and that a noncompliant plan "bears the burden of proof on this issue." *Id.* at 57–58 (internal quotation marks omitted). The Connolly Letter's failure to include any of the information required under 29 C.F.R. § 2560.503-1(g)—and Defendants' failure to provide any of that information to Plaintiff until almost five months later in the Andrews Letter—is not similar to the scenarios envisioned by the *Halo* court, such as responding one hour or one day late, where such delays do not harm the claimant in a material way.[10] *See* 819 F.3d at 57. For that reason, under *Halo*, I would be justified in reviewing the adverse benefits determination de novo. Nonetheless, out of an abundance of caution, and because I find that the Plans' denial of Plaintiff's benefits cannot withstand any potentially applicable standard of review, I review the denial under the more deferential arbitrary-and-capricious standard.

---

[10] Defendants' argument that the noncompliance was inadvertent and harmless also fails because the Andrews and Foley Letters also did not include the "specific reason or reasons" that Plaintiff's resignation was reclassified under § 7.5 of the EPP and § 8.5 of the EPDCP, which led to the "adverse determination," *see* 29 C.F.R. § 2560.503-1(g)(1), (j)(1), and therefore they also did not comply with the ERISA Procedures Regulation.

### B.      *Evidence Considered*

Typically, courts limit their review of an ERISA benefits denial to the administrative record as it existed when the adverse benefits determination was made.  *See, e.g.*, *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 66–67 (2d Cir. 1997).  However, "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause."  *Halo*, 819 F.3d at 60 (quoting *DeFelice*, 112 F.3d at 66).  Good cause may be present where there is "[a] demonstrated conflict of interest in the administrative reviewing body," *DeFelice*, 112 F.3d at 67, when a "plan's failure to comply with the claims-procedure regulation adversely affected the development of the administrative record," *Halo*, 819 F.3d at 60, or that the "claimed reason for denying a claim was not stated in notices to the claimant," *Ricciardi v. Metro. Life Ins. Co.*, No. 16-CV-3805(CM), 2019 WL 652883, at *12 (S.D.N.Y. Feb. 15, 2019).  In this case, I permitted the parties to take certain limited discovery to further develop the record regarding the conflict of interest and the reasons for Plaintiff's departure.  In light of the demonstrated conflict of interest, *see infra* Part IV.C.2, the procedural irregularities, *see supra* Part IV.A.2, and Defendants' failure to provide Plaintiff with the specific reason for the reclassification of his resignation, *see infra* Part IV.D.2, I find that there is good cause to consider evidence outside of the Administrative Record for certain purposes, but I note that I will only consider that evidence as it relates to the reasons for the adverse benefits determination that were included in the Connolly, Andrews, and Foley Letters.  I will not consider any additional reasons for the adverse benefits determination offered in Defendants' briefing of the motions currently before me or by Liberty Mutual employees during discovery.  *See infra* Part IV.D.2.

### C. *Conflict of Interest*

#### 1. Applicable Law

When the administrator of an ERISA benefits plan, "such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," there is a conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 112 (2008) ("In such a circumstance, every dollar provided in benefits is a dollar spent by the employer; and every dollar saved is a dollar in the employer's pocket." (internal quotation marks omitted)). A demonstrated conflict of interest "does not make *de novo* review appropriate." *McCauley*, 551 F.3d at 133. Instead, courts must "weigh the conflict as a factor" in evaluating whether a denial was arbitrary and capricious. *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010). "The weight given to the existence of the conflict of interest will change according to the evidence presented." *McCauley*, 551 F.3d at 133. A conflict of interest is more important "where circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117. The conflict is less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Id.*

#### 2. Application

The dual role played by Liberty Mutual as both the administrator of the Plans and as the entity that funds the Plans creates a classic conflict of interest. *See Glenn*, 554 U.S. at 112 (noting that a conflict of interest is "clear where it is the employer that both funds the plan and evaluates the claims"); *see also McCauley*, 551 F.3d at 133 (finding that "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of

discretion"); *Durakovic*, 609 F.3d at 138 ("Employer-administrators have a categorical conflict."). Defendants do not dispute that there is a conflict of interest; instead, they argue that I should accord the conflict little or no weight in determining whether the Plans' denial of benefits was arbitrary and capricious. (*See* Defs.' Opp'n 11–17.)

The law provides that I cannot give any weight to the conflict "in the absence of any evidence that the conflict actually affected [Liberty Mutual's] decision." *Durakovic*, 609 F.3d at 138 (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009)). In *Durakovic v. Building Service 32 BJ Pension Fund*, the Second Circuit identified several types of evidence that might lead a court to more heavily weight a conflict: (1) a history of biased claims evaluation; (2) unreasonably relying on some evidence that aligns with an administrator's interests, to the detriment of other more detailed evidence, without further investigation; (3) behaving "deceptively toward the benefits applicant"; and (4) taking "seemingly inconsistent positions that were both financially advantageous." 609 F.3d at 140 (internal quotation marks omitted).

First, there is no evidence in the record suggesting—and Plaintiff does not argue—that Liberty Mutual has a history of biased claims evaluation.

Second, the May 3 and May 12 Notes, which Liberty Mutual provided in purported support of the reclassification—without explanation as to their origin or their contents—appear to indicate that Liberty Mutual reclassified his departure because "[Plaintiff] Leaving and direct solicitation is concern," and they stated, "term for cause related to his leaving & taking all those people & doing severe damage to our business." (Admin. R. 872.) Despite apparently relying on these notes which suggest Plaintiff somehow encouraged other employees to leave Liberty Mutual—and that such encouragement justified, at least in part, the reclassification of his

resignation to a termination for cause—Liberty Mutual nevertheless virtually ignored and dismissed as irrelevant thirty-one sworn affidavits from former Liberty Mutual employees employed at Aspen, each asserting under penalty of perjury that the affiants were "not recruited or solicited by [Plaintiff] to leave [their] employment with [Liberty Mutual] at any time, including when [Plaintiff] was employed with [Liberty Mutual]." (*See id.* at 750–83.) Instead, even on appeal, Ms. Foley apparently relied on the May 3 and May 12 Notes, whose reliability is questionable. *See infra* Part IV.D.2. The reliance on this evidence, in spite of Plaintiff's more concrete evidence, without further explication or investigation into the specific allegations regarding Plaintiff's misconduct, indicates that the conflict of interest may have impacted the benefits denial.[11] *See McCauley*, 551 F.3d at 138 (finding that a plan administrator's "reliance on one medical report in support of its denial to the detriment of a more detailed contrary report without further investigation was unreasonable"). The Foley Letter stated that Plaintiff's "contention that the plan administrator must provide evidence to justify the reclassification . . . [was] misfocused." (*See* Admin. R. 802.) To the contrary, although "nothing requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case," "it may be arbitrary and capricious for the administrator to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further." *Roganti v. Metro.*

---

[11] The Foley Letter states that Ms. Foley "further investigated the circumstances giving rise to the termination for cause" by speaking "with the [Liberty Mutual] officers who made or were involved in the decision, studied their reasons, and reviewed evidence supporting their concerns with the business disruption and tainted [Liberty Mutual] reputation caused by [Plaintiff's] departure." (*See* Admin. R. 801.) However, other than this reference, Ms. Foley's investigation is not reflected in any part of the Administrative Record. Ms. Foley later testified that she "wanted to speak to the individuals involved from the company that made the determination, and so [she] did do [her] own personal due diligence to have [her] own sense of comfort that it was done in a fair way." (Foley Dep. 19:10-23.) As part of that due diligence, she "asked folks the circumstances and the decisions that they arrived at, the circumstances that they reviewed and their decision," but the details and results of that review are not in the administrative record, and her testimony did not reveal any additional material details about the alleged misconduct. She also "did not investigate whether [the company followed proper procedures]" because she "had confidence that they did," even after reviewing the affidavits submitted by Plaintiff. (*Id.* at 21:4-21:13.)

*Life Ins. Co.*, 786 F.3d 201, 213 (2d Cir. 2015) (internal quotation marks omitted).

Third, Liberty Mutual's pattern of lack of candor—which essentially amounts to deception by failing to disclose material information—toward Plaintiff indicates that the conflict of interest may have had an impact on the benefits determination. Notwithstanding Plaintiff's repeated requests, Liberty Mutual employees failed to provide an explanation—other than through the use of vague and conclusory language—of how Plaintiff "acted or failed to act in such a manner that would have provided grounds for a 'cause' termination." (*See* EPP § 7.5; EPDCP § 8.5; *see also* Admin. R. 11 (Connolly Letter, stating, without further explanation, that "[a]s a result of information uncovered after your voluntary resignation on October 25, 2015, we are reclassifying your termination from a voluntary resignation to a termination for cause"); *id.* at 358 (Andrews Letter, stating, without further explanation, that "[t]he circumstances surrounding [Plaintiff's] departure and their resulting disruption to [Liberty Mutual's] business provide ample evidence that [Liberty Mutual] acted in good faith"); *id.* at 801 (Foley Letter identifying, without further explanation, "concerns with the business disruption and tainted [Liberty Mutual] reputation caused by [Plaintiff's] departure").)

Moreover, Defendants point out that a Liberty Mutual policy "provides that all terminated employees have the right to appeal any termination decision" by submitting a "written request to Liberty Mutual's Executive Vice President, Chief Human Resources and Administration Officer," and that "Plaintiff never took advantage of this protocol by submitting a written request for a review of [Ms.] Connolly's decision to reclassify his separation as a termination for cause." (Defs.' Mem. 8.)[12] However, even though Plaintiff sent letters stating

---

[12] "Defs.' Mem." refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated December 7, 2017. (Doc. 71.)

that he "did not engage in any conduct during his employment that would fall under any reasonable definition of the word [cause]," directly challenging the for-cause determination, (Admin. R. 6; *see also id.* at 285 (Plaintiff stating that the Connolly Letter "shockingly informed [him] . . . that [his] resignation [had been] reclassified to a termination for 'cause'"); *id.* at 361–64; *id.* at 369 ("[Plaintiff] did not engage in any improper activity that can constitute 'cause' under any reasonable definition of that term[.]")), Liberty Mutual never provided a copy of this protocol to Plaintiff or told Plaintiff of his right to appeal the termination decision, (*see generally id.*).

Moreover, under Liberty Mutual's policies, challenges both to for-cause terminations and to benefits denials would be sent to the human resources department. (*See* Nowak Decl. Ex. 6, § 1720; Bernstein Decl. Ex. M.)[13] Any reasonable person in that department would have construed and interpreted the language that Plaintiff used in several of his letters as challenges to the for-cause determination, and, to the extent that Ms. Andrews and Ms. Foley incorrectly construed the reclassification decision as unreviewable under the Plans, they should have passed the letters along to the appropriate personnel within the department and/or informed Plaintiff to do so, especially in light of the fact that Plaintiff did not have a copy of—and therefore could not have known about—the policy indicating the specific Human Resources employee to whom for-cause challenges should be addressed. With the knowledge that Plaintiff sought all documents relevant to the reclassification, Liberty Mutual's refusal to even provide him with a copy of the Manager Policy Manual[14]—and then to hold his failure to comply with the procedures within it

---

[13] "Nowak Decl." refers to the Declaration of Richard E. Nowak, dated December 7, 2017, (Doc. 69), which was provided in support of Defendants' motion for summary judgment.

[14] The Manager Policy Manual sets forth Liberty Mutual's policies and procedures related to employee discipline and for-cause terminations. (*See* Nowak Decl. Ex. 6.)

against him—amounts to a "gotcha" and is deceptive conduct that further evidences that the conflict of interest may have influenced the benefits denial. *See Durakovic*, 609 F.3d at 140 (noting that the Second Circuit had more heavily weighted a conflict where the administrator "behaved deceptively toward the benefits applicant").

Fourth, I note that unbeknownst to Plaintiff and before Plaintiff submitted his two-week notice on October 12, 2015, Defendants had intended to terminate his employment without cause on October 15, 2015. (*See* Bernstein Decl. Ex. I.) This apparent conclusion that there was no basis to terminate Plaintiff's employment for cause is inconsistent with Liberty Mutual's December 23, 2015 determination—after Plaintiff had already voluntarily resigned—that his departure should be reclassified as a termination for cause. (*See* Admin. R. 11.) Although Defendants offer explanations for this about-face, they are "seemingly inconsistent positions" that were "both financially advantageous,"[15] which indicates that the conflict of interest may have influenced the benefits denial. *See Glenn*, 554 U.S. at 118.

The *Durakovic* court also noted that a conflict should receive less weight "(perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." 609 F.3d at 140 (quoting *Glenn*, 554 U.S. at 117). When the Supreme Court articulated this factor, it cited, inter alia, a law review article that recommended "interdepartmental information walls to reduce bank conflicts." *Glenn*, 554 U.S.

---

[15] Although there is no direct evidence in the record demonstrating the respective financial advantages, it seems obvious that offering a retirement and severance package to an executive whose departure is forced would protect Liberty Mutual's reputation as a company that treats its executives well. The financial advantage of terminating Plaintiff's benefits, thereby deterring other senior officers from departing for competitors, is self-evident, particularly where both Plans were unfunded. (*See* Defs.' 56.1 Resp. ¶¶ 4–5.)

at 117 (citing Herzel & Colling, The Chinese Wall and Conflict of Interest in Banks, 34 Bus. Law 73, 114 (1978)).  Liberty Mutual has not demonstrated that it had any such protections in place.  To the contrary, Ms. Connolly and Ms. Andrews reported to the same supervisor, who reported directly to Ms. Foley, (Bernstein Decl. Ex. M.), and Ms. Foley was aware of the reclassification around the time that it occurred, and well before she received Plaintiff's July 21 Appeal, (*see* Foley Dep. 1165:22-1166).

### D.    Adverse Benefits Determination Review

#### 1.  Applicable Law

When adopting the more deferential standard of review for ERISA benefits denials, courts "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Hobson*, 574 F.3d at 82 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir. 1995)).  An administrator's decision is arbitrary and capricious when it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley*, 551 F.3d at 132 (quoting *Pagan,* 52 F.3d at 442).  Courts have defined "substantial evidence" as "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator"; substantial evidence "requires more than a scintilla but less than a preponderance." *Durakovic,* 609 F.3d at 141 (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003)); *see also Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).  Plan administrators "may exercise their discretion in determining whether a claimant's evidence is sufficient to support his claim." *Roganti*, 786 F.3d at 212.  If the record is underdeveloped, administrators may have to make a "reasonable effort" to further develop the record. *Id.* at 313.

## 2. Application

In November 2000, the Department of Labor revised the ERISA Procedures Regulation. *See* ERISA Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246 (Nov. 21, 2000).  The preamble of that revision stated that one of its purposes was "to improve access to information on which a benefit determination is made," and that another purpose was to "assure that participants and beneficiaries will be afforded a full and fair review of denied claims."  *Halo*, 819 F.3d at 49 (quoting 65 Fed. Reg. at 70,246).  One of the new provisions was intended to "clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference."  *Id.* at 50 (quoting 65 Fed. Reg. at 70,255).  Notwithstanding the several procedural irregularities in Defendants' review of Plaintiff's claim for benefits, *see supra* Part IV.A.2, I review the Plans' adverse benefits determination under the deferential arbitrary-and-capricious standard.  Nonetheless, I conduct my review with the fundamental goals of "improve[d] access to information" and "procedural fairness" in mind.  *Halo*, 819 F.3d at 49–50.

Under the plain terms of the Plans, the Connolly Letter must be construed as notice to Plaintiff that Liberty Mutual was exercising its option under the Plans to terminate his benefits because "evidence [was] acquired after [his] employment termination" that he "acted or failed to act in such a manner that would have provided grounds for a 'cause' termination."  *See supra* Part IV.A.2.  This letter, which was an eligibility determination under the terms of the Plans, was an adverse benefit determination for the purposes of the ERISA Procedures Regulation.  *See* 29 C.F.R. § 2560.503-1(m)(4).  Whether Ms. Connolly was authorized to make this determination under the Plans or company policy is of no moment, because Ms. Andrews and Ms. Foley

subsequently affirmed and reaffirmed that determination in their own letters. (*See* Admin. R. 357–60, 800–04.) Ms. Foley attempted to distance her review of Plaintiff's benefits denial from the determination in the Connolly Letter because "it is [Liberty Mutual], not the plan administrator, who determines whether cause exists in classifying an employee's termination." (*Id.* at 802.) This statement ignores the plain terms of the Plans, which state that Liberty Mutual is the plan administrator, (*see* EPP §§ 2.1, 2.9; EPDCP §§ 2.1, 2.10); in other words, for all intents and purposes they are one in the same. Defendants do not identify any authority suggesting that Liberty Mutual's delegation of authority to a particular employee to review appeals of denied claims alters this conclusion in any way.

Nonetheless, despite Plaintiff's numerous requests, the Connolly Letter, Andrews Letter, Andrews Follow-up Letter, and Foley Letter each failed to provide "[t]he specific reason or reasons" for the adverse benefits determination, as required by the ERISA Procedures Regulation. *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (j)(i). The Andrews Letter, Andrews Follow-up Letter, and Foley Letter also failed to provide Plaintiff a "full and fair review" of the decision to terminate his benefits, *see Firestone*, 489 U.S. at 113; *see also* 29 U.S.C. § 1133(2). A "full and fair review" includes "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decisionmaker consider the evidence presented by both parties prior to reaching and rendering his decision." *Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02 Civ. 9154(GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004) (internal quotation marks omitted). "Federal regulations further require that claims reviewers make available all documents relevant to an adverse claim determination upon request of the claimant." *Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 435 (S.D.N.Y. 2005) (citing 29 C.F.R. § 2560-503.1(h)(2), (3)), *aff'd*, 517

F.3d 614 (2d Cir. 2008). Although certain documents, such as the May 3 and May 12 Notes, were provided to Plaintiff after repeated requests, Ms. Andrews apparently also reviewed documents not provided to Plaintiff, such as an insurance industry publication that portrayed the departure of several Liberty Mutual employees to go to Aspen as a "raid." (*See* Pl.'s 56.1 Resp. ¶ 61 (conceding that Ms. Andrews "also reviewed other written materials in evaluating Plaintiff's claim for benefits"); Nowak Decl. Ex. 15.)[16] The failure to provide Plaintiff with the specific reasons for the adverse benefits determination and to provide him with all of the documents relied upon by the Plans' administrators prejudiced Plaintiff and impeded his right to a full and fair review. *See McCauley*, 551 F.3d at 136 ("Had [plaintiff] been apprised of the [specific reasons for the denial, he] plainly would have had no trouble addressing [the administrator's] undisclosed and uninvestigated concerns.").

Defendants argue that I should not review the reclassification of Plaintiff's resignation at all. (*See* Defs.' Mem. 1 ("The sole dispositive issue in this ERISA benefits case is whether [Ms.] Foley's denial of Plaintiff's benefits appeal was arbitrary and capricious."); Defs.' Opp'n 2 ("Plaintiff's arguments . . . improperly conflate an employment decision with a plan administrator's benefit eligibility determination.").) As an initial matter, Defendants offer no authority in support of the position that I should not review the reasonableness of the decisions underlying the initial adverse benefits determination. To the contrary, courts often consider each decision made by plan administrators throughout an ERISA claims procedure. *See, e.g.*, *Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*, 1 F. Supp. 3d 72, 86–87 (W.D.N.Y.) (rejecting a similar argument), *aff'd*, 594 F. App'x 696 (2d Cir. 2014). To the extent that Ms.

---

[16] The insurance industry publications reviewed by Ms. Andrews were published subsequent to Ms. Connolly's December 23, 2015 initial reclassification of Plaintiff's resignation to a termination for cause.

Foley's final determination relied on the Connolly Letter, Andrews Letter, and Andrews Follow-Up Letter, any deficiencies in those letters must be weighed in determining whether Ms. Foley's reliance on their conclusions was arbitrary and capricious.

Defendants argue that "Plaintiff never challenged [Ms.] Connolly's employment reclassification decision and this ERISA benefits lawsuit is not a proper forum to do so." (Defs.' Opp'n 16.) I have already explained why Defendants' determination that they had evidence demonstrating that Plaintiff's conduct could have provided grounds for a for-cause termination was an action taken pursuant to the Plans, and that their attempt to distinguish that determination from the adverse benefits determination therefore fails. *See supra* Part IV.A.2. I have also already explained that Defendants' failure to provide Plaintiff with the procedures—purportedly distinct from the benefits review procedures—to seek review of the Connolly Letter's for-cause determination was an example of deceptive conduct that indicates a likelihood that Defendants' conflict of interest may have impacted the adverse benefits determination. *See supra* Part IV.B.2. I further find that, to the extent Defendants did incorrectly construe the Connolly Letter as an employment decision and not a benefits decision, their failure to comply with their own policies regarding for-cause terminations is further evidence that the adverse benefits determination was arbitrary and capricious.

The Manager Policy Manual, which was not provided to Plaintiff and is not a part of the Administrative Record, sets forth the policies and procedures that govern discipline, probation, and terminations for cause at Liberty Mutual. (*See* Nowak Decl. Ex. 6.) Other than in exceptional circumstances, Liberty Mutual addresses poor performance using a system of progressive discipline, beginning with warning, proceeding to probation, and ending with job action. (*See id.* § 1705, § 1715 ("In most cases, employees whose performance is unsatisfactory

will be counseled in accordance with [§] 1705 – Discipline & Probation Procedure.").) The Manager Policy Manual also contemplates circumstances in which "performance failures are so severe" or "employee misconduct [is] so serious, that they may, in the judgment of the management, warrant the employee's termination upon the first occurrence." (*See id.* § 1705.)

Section 1715, which governs for-cause terminations, requires that, in all situations, "the employee's actions or behaviors should be investigated and/or verified" because "it is especially important that management's decisions be based on a complete understanding of the relevant facts." (*Id.*) It also instructs that "[w]here appropriate and practical, the employee should be afforded an opportunity to address all allegations." (*Id.*) The Manager Policy Manual provides that immediate termination "should occur only after confirmation of the inappropriate actions or behaviors" and must be authorized by the Home Office Employee Relations. (*Id.*) If it is authorized, managers are instructed to "advise/remind the employee of the specific behavior for which they are being disciplined" and to provide "the results of any investigation/verification." (*Id.*)

There is no evidence in the Administrative Record—and Defendants have not produced any evidence in support of their motion for summary judgment— indicating that Plaintiff was advised of all of the allegations against him, let alone that Plaintiff had "an opportunity to address all allegations." Although Ms. Connolly testified that she "reviewed facts and circumstances" prior to the reclassification decision, (Connolly Dep. 48:4-14)[17], and Ms. Andrews and Ms. Foley indicated in their letters that they independently reviewed the reclassification, (Admin. R. 358, 801), they did not "advise/remind" Plaintiff of any behavior for

---

[17] "Connolly Dep." refers to the Deposition of Mary Connolly, dated July 20, 2017, which is attached as Exhibit E to the Bernstein Declaration. (Docs. 72-41–72-47.)

which he was being disciplined, let alone the specific behavior, and they did not provide him with "the results of [their] investigation[s]." Although Defendants argue that Plaintiff should have pursued review of the reclassification through this process—even though he was unaware of it—Liberty Mutual's own failure to comply with even the most basic provisions of the policy is yet another example of a "one-sided decisionmaking process [that] can alone constitute sufficient evidence that the administrator's conflict of interest actually affected the challenged decision." *Roganti*, 786 F.3d at 218.

In support of their motion, Defendants identify several bases for Ms. Connolly's reclassification decision that were not articulated in the Connolly Letter, Andrews Letter, Andrews Follow-up Letter, or Foley Letter: (1) "Plaintiff breached his fiduciary duties as a Liberty Mutual executive," (Defs.' Mem. 6); (2) Plaintiff caused "substantial disruption . . . to the [Liberty Mutual] business prior to his departure," (*Id.* at 6–7); (3) Plaintiff "did not provide adequate notice of his alleged retirement given his leadership position within [Liberty Mutual]", (*Id.* at 7); (4) "Plaintiff had violated his responsibility to the company as an officer," (*Id.* (internal quotation marks omitted)); (5) Plaintiff misrepresented "that he was retiring when he was actually planning to defect to Aspen," (*Id.* at 7); and (6) Plaintiff's benefits could have been denied under § 7.2 of the EPP and § 8.3 of the EPDCP because Plaintiff "did not execute a Post-Employment Restriction Agreement" and "could not have complied with such an agreement because he immediately went to work for a competitor," (Defs.' Mem. 22). I need not include any of these bases in my review because they were "never before disclosed to [Plaintiff, and so] cannot now be asserted to deny [his] benefits." *Curry v. Am. Int'l Grp., Inc. Plan No. 502*, 579 F. Supp. 2d 413, 422 (S.D.N.Y. 2008), *aff'd sub nom. Curry v. Am. Int'l Grp., Inc.*, 341 F. App'x 731 (2d Cir. 2009); *see also Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 535

(S.D.N.Y. 2009) ("In determining whether relevant factors were considered and substantial evidence relied upon in an ERISA eligibility determination, courts are limited to the reasons given at the time of the denial." (internal quotation marks omitted)).

Finally, I must weigh Defendants' conflict of interest as a factor in determining whether Ms. Foley's denial of Plaintiff's July 21 Appeal was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley*, 551 F.3d at 132 (quoting *Pagan,* 52 F.3d at 442). Again, I am limited to reviewing the reasons articulated in the Connolly, Andrews, Andrews Follow-Up, and Foley Letters and the purported evidence in support of those reasons.[18] The stated reason in the Foley Letter for the reclassification of Plaintiff's resignation and accordant denial of benefits was that certain Liberty Mutual "officers" had "concerns with the business disruption and tainted [Liberty Mutual] reputation caused by [Plaintiff's] departure." (Admin. R. 801.) Ms. Foley clarified that, contrary to the reasons stated in the May 3 and May 12 Notes, Plaintiff's termination was not "based solely on the substantial number of employees that joined him at his subsequent employer"; rather, it was "based on evidence of the overall disruption and harm to the business caused by [Plaintiff]." (*Id.* at 802.)

The only evidence identified in the Foley Letter—other than Ms. Foley's conversations with unidentified Liberty Mutual officers[19]—are the "notes provided by [Ms.] Andrews." The May 3 and May 12 Notes are unreliable for several reasons: (1) the Notes were taken during meetings held almost four months after the reclassification decision had been made in the Connolly Letter; (2) to the extent that the Notes appear to include statements about the

---

[18] Although I am considering evidence outside the Administrative Record, *see supra* Part IV.B, I focus my review on the evidence that was actually provided to Plaintiff.

[19] The Foley Letter does not identify these officers, and it does not provide any additional detail about the substance of those conversations or when and where they occurred, or whether these officers provided documents to support their statements to Ms. Foley.

performance of Plaintiff's division before and after his departure, those statements are vague and are not accompanied by supporting documents or data that would provide Plaintiff any meaningful opportunity to rebut the evidence and allegation of poor performance; (3) to the extent that the Notes appear to include statements about the performance of Plaintiff's division before and after his departure, those statements are contradicted by Liberty Mutual's own determination prior to Plaintiff's resignation that it would terminate his employment without cause and provide him with at least one year's severance, (Defs.' 56.1 Resp. ¶ 12); and (4) to the extent that the Notes appear to include statements that imply that the reclassification decision was based on Plaintiff's solicitation of other Liberty Mutual employees, that reason is rebutted by an affidavit submitted by Plaintiff and affidavits from thirty-one other former Liberty Mutual employees, (Admin. R. 747–83).  For those reasons, I hesitate to refer to the May 3 and May 12 Notes as even a "scintilla" of evidence; they certainly are not substantial evidence of the type that "a reasonable mind might accept as adequate to support the conclusion reached by the administrator." *Durakovic,* 609 F.3d at 141 (internal quotation marks omitted).

As the final decisionmaker, Ms. Foley stated that the reason for the adverse benefits determination was "concerns with the business disruption and tainted [Liberty Mutual] reputation caused by [Plaintiff's] departure," the "overall disruption and harm to the business caused by Plaintiff," and other "problems and issues resulting from [Plaintiff's] departure."  (*See* Admin. R. 801–02.)  If there was any "disruption" at Liberty Mutual before or after Plaintiff's departure, there is no reliable evidence in the record—either in the Administrative Record or in the exhibits provided in support of the parties' motions—demonstrating specifically what that disruption entailed.  More importantly, Defendants did not provide any evidence that the disruption was a result of Plaintiff acting or failing to act "in such a manner that would have

provided grounds for a 'cause' termination," as required by the Plans. (*See* EPP § 7.5; EPDCP § 8.5.)[20] To the contrary, when asked if she "ever saw any evidence of actual wrongdoing by [Plaintiff]," Ms. Connolly, who made the reclassification decision, testified, "Thinking about it. Not that I saw, no." (Connolly Dep. 47:16-20; *see also* Pl.'s 56.1 Resp. ¶ 40; *see also* Foley Dep. 89:10-15 (acknowledging that a review of Plaintiff's emails did not identify any evidence of wrongdoing).) In addition, the fact that evidence is not only required by the ERISA Procedures Regulation but is also an express requirement of the specific sections of the Plans on which the denial was based, (*see id.*), the absence of any reliable evidence on which the adverse benefits determination could be based is all the more troubling, and also demonstrates that the denial was arbitrary and capricious.

Defendants argue that because the Plans give the administrator the authority in its discretion to "construe and interpret the terms of the Plan[s], (EPP § 3; EPDCP § 3), that Ms. Foley's interpretation of the For-Cause Sections generally, and the word 'cause' specifically, is not subject to review," (Defs.' Mem. 19). However, "where the administrator . . . interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund*, 559 F.3d 140, 147 (2d Cir. 2009) (quoting *McCauley*, 551 F.3d at 133). I must interpret the Plans "in an ordinary and popular sense as would a person of average intelligence and experience." *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (internal

---

[20] The Andrews and Foley Letters also identify § 9 of the EPP as a provision pursuant to which Plaintiff's benefits were denied. (*See* Admin. R. 358, 801.) In pertinent part, that section states, "A Participant's [benefits], whether vested or unvested, shall be immediately forfeited if a Participant's employment is terminated by [Liberty Mutual] for cause under [§] 7.5 above." (*See* EPP § 9.) It is clear from the plain language of that provision that it refers to the circumstance contemplated by the first sentence of § 7.5, under which Liberty Mutual terminates a participant's employment, and not the circumstance before us, which is contemplated by the second sentence of § 7.5, in which Liberty Mutual does not terminate a participant's employment for cause, but makes an eligibility determination based on evidence acquired after an employee has left Liberty Mutual. *See also supra* Part IV.A.2.

quotation marks omitted).  At the time they wrote their respective letters, the only alleged

"manner" in which Plaintiff "acted or failed to act . . . that would have provided grounds for a

'cause' termination," (EPP § 7.5; EPDCP § 8.5), for which there was substantial evidence was

leaving Liberty Mutual to work for a competitor.  It is undisputed that Plaintiff was not subject to

any non-competition or non-solicitation agreement with Liberty Mutual.  (*See* Defs.' 56.1 Resp.

¶ 18.)  Because the act of departing a company cannot alone constitute "cause" under any

reasonable interpretation of the word, *see Critchlow*, 378 F.3d at 256, I find that the Plans were

arbitrary and capricious in denying Plaintiff's benefits under the EPP and EPDCP, because they

did not acquire evidence that Plaintiff "acted . . . in such a manner that would have provided

grounds for a 'cause' termination."  (EPP § 7.5; EPDCP § 8.5.)

"[I]if upon review a district court concludes that the [administrator's] decision was

arbitrary and capricious, it must remand to the [administrator] with instructions to consider

additional evidence unless no new evidence could produce a reasonable conclusion permitting

denial of the claim or remand would otherwise be a useless formality.  *Miller v. United Welfare

Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (internal quotation marks omitted).  Defendants have

had ample opportunity to submit documents and information related to the denial of Plaintiff's

benefits under the EPP and EPDCP, both in response to Plaintiff's discovery requests, (*see* Doc.

40), and in support of their motion for summary judgment.  Their failure to provide any evidence

that the reclassification of Plaintiff's resignation under the For-Clause Sections was reasonable

demonstrates that no such evidence exists, and that remand would be a "useless formality."  *See

Solomon v. Metro. Life Ins. Co.*, 628 F. Supp. 2d 519, 533 (S.D.N.Y. 2009) (internal quotation

marks omitted).

## V.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.  Defendants are directed to grant Plaintiff's claim for benefits and to provide them pursuant to the terms of the Plans.

The Clerk of Court is respectfully directed to terminate the open motions at Documents 65 and 68 and to close the case.

SO ORDERED.


Dated: March 31, 2019
       New York, New York

Vernon S. Broderick
United States District Judge